[Civ. No. 31717. Second Dist., Div. Two. Feb. 5, 1969.]

EXCELSIOR UNION HIGH SCHOOL DISTRICT OF LOS ANGELES COUNTY, Plaintiff and Appellant, v. MINNIE MARGARET LAUTRUP et al., Defendants and Respondents.

436

Harold W. Kennedy and John D. Maharg, County Counsel, and Alfred Charles De Flon, Deputy County Counsel, for Plaintiff and Appellant.

Thomas G. Baggot and George E. Atkinson, Jr., for Defendants and Respondents.

HERNDON, J.—Excelsior Union High School District of Los Angeles County, the plaintiff in this eminent domain proceeding, appeals from the trial court's order awarding defendants and respondents a total of $77,265 for attorneys' fees following plaintiff's abandonment of the proceeding. The award was made pursuant to the provisions of section 1255a of the Code of Civil Procedure.

For the purpose of facilitating the reader's understanding of the relevance of the facts to be recited in our statement of the case, we shall first set forth this brief summary of appellant's basic contentions, namely:

(1) That the trial court erroneously based its award in part either upon an implied finding that respondents' attorneys "caused the abandonment" of the proceeding or upon the provisions of contracts between respondents and their attorneys wherein respondents agreed to pay counsel not less than $100,000 in the event of abandonment.

(2) That in fixing the amount to be allowed respondents for the services of their attorneys, the trial court could not properly take into consideration any of the services of counsel which influenced appellant's governing board to abandon the proceeding.

(3) That the award made by the trial court was based in substantial part upon services involving "political representation," which services, notwithstanding their propriety and

their value to respondents, are not properly compensable under the provisions of section 1255a.

For reasons we shall develop in the course of this opinion, we have concluded that none of these assignments of error is well taken and that the order should be affirmed.

On February 1, 1963, appellant filed its complaint seeking to acquire for use as a high school site approximately 27.7 acres of land owned by respondents and located at the southwest corner of Imperial Highway and Valley View Avenue in the City of La Mirada, California. The land constituted one of the last remaining large parcels of land in this rapidly developing area and respondents earnestly desired to retain it as they indicated by their vigorous and continued efforts to persuade the school district to abandon the project.

George E. Atkinson, Jr., was acting as attorney for Norman Lautrup, executor of the estate of Niels P. H. Lautrup, who had died shortly before the filing of this action. The estate owned a one-half interest in the property and Minnie Margaret Lautrup owned the remaining one-half interest. Although Mr. Atkinson notified appellant that he represented the owners, and received its permission to withhold filing answers to the complaint until notified so to do, he allowed appellant to negotiate directly with the owners for several months without his participation to the end that an amicable settlement might be achieved if possible.

When settlement negotiations failed he, in effect, "associated" Mr. Thomas G. Baggot to assist him in the defense of appellant's action. Minnie Lautrup executed an employment contract with Mr. Baggot on November 21, 1963, in which it was agreed that in accordance with a certain schedule, Mr. Baggot was to receive a contingent fee based upon a percentage of all sums received by Minnie Lautrup in excess of the amount offered her by appellant for her interest in the property. On the same date an identical contract was executed by Mr. Atkinson and Norman Lautrup, as executor. This latter contract was approved by the probate court. Each of these contracts contained the following provision:

"That in the event of an abandonment, either express or by operation of law, by the said School District of said action, the undersigned will pay to [attorney] a reasonable attorney's fee, not less than $50,000.00 for his services performed up to the time of abandonment and for any service performed with relationship to said abandonment, including, but not

limited to the securing of said fee upon abandonment from said School District.''

Appellant offered the owners $864,000, or approximately $.72 per square foot, for their property. This figure apparently represented the opinion of value of one of appellant's appraisers who had used a valuation date substantially earlier than would have been used at the trial if the proceeding had not been abandoned. The owners' two appraisers opined that the property was worth $1,900,000 and $1,700,000, respectively, as of the correct valuation date. The property had been appraised in the probate proceeding by the inheritance tax appraiser at $1,363,700 although he had used an even earlier valuation date than had appellant's appraisers.

Appellant's complaint also sought to condemn another smaller parcel of allegedly less valuable property owned by persons other than respondents. Appellant purchased this property during the pendency of this proceeding for $170,000, or approximately $1.28 per square foot. In addition, on January 29, 1964, respondents allegedly received a bona fide offer of $1,900,000 for the property contingent upon the condemnation action being abandoned. This offer was rejected.

We need not, and do not, speculate as to the amount the trier of fact might have awarded respondents as compensation for the subject property if the action had been tried. The foregoing recital, however, sufficiently indicates the extent and value of the subject matter of the litigation and its importance to the parties.

The pleadings filed herein were of a terse and standard variety but as in any case, and particularly in a condemnation action, these formal records usually reflect only a very small portion of the attorney's work product in the proceeding. Initially, the only matters in issue were the date of value, the fair market value of the property, and the question of severance damages, if any. However, on August 3, 1964, the initial pretrial conference order was amended, and amended answers were filed, to eliminate the issue concerning severance damages and to present another issue, namely, whether or not the property was, in fact, being taken for a public use.

While the instant action was pending, on or about October 6, 1964, an election was held by the electors of appellant Excelsior Union High School District upon propositions presenting the question whether or not the whole territory of the district should be formed into two unified school districts. These proposals ultimately were adopted and on June 30,

1965, appellant ceased to exist as a legal entity. We need not consider the question whether or not the newly created unified district in which the subject property was located might have continued the action for the reason that its governing board unanimously resolved on February 18, 1965, "that the County Counsel's Office be requested to drop the present condemnation suit pending on the Lautrup property and to negotiate with the property owners on a settlement of the suit."

On April 30, 1965, the appellant's governing board also unanimously resolved to "authorize the County Counsel's office to proceed to abandon condemnation action on Lautrup Dairy site and proceed with necessary steps to pay abandonment costs." As respondents' attorneys pointed out to the trial court, the members of the board who moved and seconded this resolution were the two members thereof whose depositions had been taken by respondents in preparation for trial on the issue of public use.

On December 28, 1965, respondents' motion for judgment of dismissal was granted and a judgment was entered with the amounts to be allowed for costs and disbursements to be later determined and inserted. In addition to their direct court costs, respondents sought recovery of the sums expended for appraisal fees and $50,000 each for the fees of their respective attorneys. Following an extended hearing and the receipt of evidence both oral and documentary, the trial court on July 18, 1966, entered the order from which the present appeal is taken.

We now return to appellant's first assignment of error which it has stated as follows: "The trial court in part based its award of attorneys' fees of $77,265.00. [the sum of $39,540 to Mr. Atkinson and $37,725 to Mr. Baggot] upon one or both of two improper factors: (1) upon the implicit findings that the efforts of one or both of defendants' attorneys were responsible for causing the abandonment; and (2) the contracts between the attorneys and their clients, each of which provided for attorney fees of not less than $50,000 in case of abandonment regardless of the value of the attorney services rendered."

We find and hold that there is nothing whatever in the record to support the assumption that the trial court based its award upon either of these factors, except only that in a discussion with counsel the court expressed the thought that in evaluating legal services the *result* accomplished should be regarded as a relevant consideration.

Respondents' employment contracts with their counsel were introduced into evidence without any objection. The trial court, and both of counsel for respondents, repeatedly emphasized and reemphasized their agreement with the observation of counsel for appellant that these contracts were not binding upon the court. Apparently they were offered and received solely for the purpose of indicating the importance which the parties attached to the services of their counsel and their view of the potential value of such services upon the happening of certain contingencies. There is nothing to indicate that the court gave any weight to them in fixing the award. The indisputable fact that the trial court awarded over $10,000 less to each attorney by way of fees than his client was obligated to pay therefor demonstrates that no improper reliance was placed on these contracts which, as we have said, were received in evidence *without objection.*

Appellant devotes a major portion of its brief to quotations from the testimony and from the arguments of respondents' counsel for the purpose of convincing this court that they were given credit for ''causing the abandonment'' by their ''political'' efforts designed to develop public sentiment in opposition to the project and to promote the creation of the new unified districts and the election of officials favoring abandonment.

The first and most salient observation that should be made on this point is that the entirety of this ''evidence'' *was received without objection by appellant.* As a matter of fact, this ''issue'' was developed very largely by appellant's cross-examination of respondents' witnesses in an apparent attempt to convince the trial court that the efforts of their counsel had been of little or no value and that they should not be rewarded by reason of the fact that fortuitous political changes had ''frustrated'' the purpose of the proceeding.

At no point during the hearing presently under review did counsel for appellant so much as hint that they regarded as improper any conduct on the part of respondents' counsel or that they were contending that appellant's decision to abandon the instant action was involuntary in any sense. On the contrary, counsel for appellant sought to prove that its decision to abandon the project was entirely voluntary and that the efforts of respondents' counsel, designed to establish that the property was not being taken in good faith for a permissible public use, and that it had grossly underestimated the

costs of its project, had been without any effect upon it whatsoever.

In essence, it was appellant's contention in the trial court that in fixing the award, no credit should be given for the "results" of the efforts of respondents' counsel because those efforts were not effective causative factors in bringing about the abandonment.

It was to this issue that the trial judge directed his comment quoted out of context in the dissenting opinion herein. This comment is not "the statement of the court itself that it considered such services [political representation] an important factor in the case." *On the contrary, it is manifest from the quotation itself that this comment of the trial judge constitutes no indication of his intention to award compensation for any services which might be classified as "political representation."* It amounts to no more than a correct observation that the contribution of counsel to *the result achieved* was "an important factor." Counsel for respondents quite properly responded by expressing their concurring view, contrary to appellant's contention in the court below, that the result achieved was indeed an important factor and one that "gets us into the labyrinth of cause and effect."

It should be emphasized that the trial court was not called upon to make any express declaration or any definitive finding to indicate what part of counsel's services were to be treated as political and noncompensable because, as we have indicated, appellant *never raised this issue in the trial court.* There is no finding of fact, either express or implied, indicating that any weight was given to "political" activities, as such. If there were we could properly reach this question now urged by appellant for the first time on appeal. If *respondents* had sought to introduce evidence of their "political" activities; if appellant had objected thereto; and if such an objection had been overruled, we would have *occasion to consider* this issue. However, *appellant itself* developed the evidence (quoted at length in the dissenting opinion) in an effort to show that respondents' counsel should not be given any credit for the *"result"* achieved in this action, that is to say, for convincing appellant's governing board that the proceeding should be abandoned.

Obviously appellant cannot now be heard to say that the trial court erred in receiving evidence which appellant itself elicited and introduced. Having created and developed this issue, appellant is in no position now to reverse its theory and

contend that counsel were entitled to no compensation for services which influenced its decision to abandon the project. (*Glendale Unified School Dist.* v. *Vista del Rossmoyne Co.,* 232 Cal.App.2d 493, 496-497 [42 Cal.Rptr. 899] ; 3 Cal.Jur.2d, Appeal and Error §§ 140, 142, pp. 604, 607.)

In both *Port San Luis Harbor Dist.* v. *Port of San Luis Transp. Co.,* 213 Cal.App.2d 689 [29 Cal.Rptr. 136], and *State of California* v. *Westover Co.,* 140 Cal.App.2d 447 [295 P.2d 96], awards of attorneys' fees in the amounts of $125,000 and $150,000, respectively, were affirmed on appeal although it was clear that the decisions of the condemning bodies to abandon the projects in those cases were in large measure due to the fact that the sums awarded for the properties by the triers of fact greatly exceeded the expectations of the condemning agencies. To the extent that the efforts of a defendant's counsel may "cause" an abandonment either before or after trial by marshaling and displaying to the condemning agency evidence tending to prove that the property is not being taken for a public use or that the condemning body's cost estimates are unrealistic, such successes may properly be considered in determining the value of his services.

On the other hand, as stated in *La Mesa-Spring Valley School Dist.* v. *Otsuka,* 57 Cal.2d 309, 312, 318 [19 Cal.Rptr. 479, 369 P.2d 7], "The right to an award of costs is . . . purely statutory. [Citations.] Code of Civil Procedure section 1255a authorizes, upon the plaintiff's abandonment of an eminent domain proceeding, the recovery of 'costs and disbursements, which shall include all necessary expenses *incurred in preparing for trial and during trial* and reasonable attorney fees.' " (Italics added.) (P. 312)

 "Of course, the defendant cannot recover any fees of his attorney incurred in connection with the proposed taking of his property unless such fees were incurred in preparation for the defense of the action. *It is only those services rendered in preparation for the trial of the proposed action that are recoverable. It is for the trial court to determine what services were rendered in preparation for trial and the reasonable value of such services."* (Italics added.) (P. 318)

It is inevitable that the boundary between compensable and noncompensable services may not always be susceptible of precise delineation. Nevertheless, the drawing of such line is within the province of the trial court, and there being nothing in the present record to justify a conclusion that it

was improperly drawn, error should not be presumed. Contentions identical to those of appellant in this case were urged and rejected in *Port San Luis Harbor Dist.* v. *Port of San Luis Transp Co., supra*, 213 Cal.App.2d at p. 695, in the following apposite language:

"It would seem that some of the other matters referred to [in counsel for defendant's summary of his services], such as a conference with the foreman of the grand jury and conferences regarding proposed new legislation on the subject of condemnation, were not services in preparation for trial. If the judge regarded some of such matters as not being services in preparation for the trial, it might well be that he found that those services were not a substantial portion of the services rendered but were comparatively inconsequential and negligible in value and should be ignored in determining the reasonable value of legal services. *It cannot properly be concluded that the court awarded attorneys' fees for services which were not rendered in preparation for the trial.* The court did not abuse its discretion in awarding $125,000 as attorneys' fees." (Italics added.)

It may also be noted that in *Port San Luis Harbor Dist.* v. *Port of San Luis Transp. Co., supra*, 213 Cal.App.2d 689, the trial court awarded defendant therein the full $125,000 requested and therefore it was necessary for the appellate court to conclude that any noncompensable items of work included in the claimant's recital of the services for which compensation was claimed were of "inconsequential and negligible value." In the instant case, however, the trial court reduced the requested allowance of $100,000 to $77,265, thereby providing further reason for this court to reject the unwarranted *assumption* that it awarded compensation for any items of service alluded to during the trial of this issue that are not entitled to consideration.

As observed in *Decoto School Dist.* v. *M. & S. Tile Co.*, 225 Cal.App.2d 310, 314-315, 316 [37 Cal.Rptr. 225]: "In our opinion, the letter and spirit of section 1255a is to make the defendant whole for the reasonable attorney fees incurred by him in connection with the defense of an eminent domain action which the condemner has voluntarily abandoned. [Citations.]" (Pages 314-315)

"Moreover, while we would not depart from the philosophy that a landowner ought to be made whole where eminent domain proceedings are abandoned pursuant to section 1255a, we do not subscribe to the concept that he necessarily should

be made whole according to his notions thereof or to the extent claimed by him." (Page 316.)

▉▉▉▉ Having rejected appellant's specific assignment of error, we now turn to a consideration of the contention that the award is excessive as a matter of law. Since this contention necessarily is equivalent to an assertion that the evidence is insufficient to support the trial court's finding that the services being evaluated were reasonably worth the amount awarded, appellant's complete failure to set forth in its brief a fair statement of the evidence in the record relevant to this issue constitutes a violation of a fundamental rule of appellate practice and procedure. (*Davis* v. *Lucas,* 180 Cal.App.2d 407, 409-410 [4 Cal.Rptr. 479].)

Nevertheless, to demonstrate the sufficiency of the evidence to support the award under review we shall summarize some of the evidence bearing upon relevant considerations such as "the amount involved [in the litigation], the skill required in its handling, the skill employed, the attention given, . . . the attorney's skill and learning, including his age and experience in the particular type of work demanded." (*La Mesa-Spring Valley School Dist.* v. *Otsuka, supra,* 57 Cal.2d 309, 316.)

As a result of their extensive investigations into the subject matter, the owners' attorneys had concluded that in the instant case it would be possible to prove that the condemning body did not intend in good faith to take the property for a true public use. (Cal. Const., art. I, § 14; *People* v. *Chevalier,* 52 Cal.2d 299 [340 P.2d 598].) They expected to establish this fact, despite the conclusive nature of the condemning body's resolution as to necessity (Code Civ. Proc., § 1241, subd. (2)), by proof (1) that there was neither a present nor future need for a school to be located upon the proposed site; (2) that it was impossible for the school to be financed or built within the next seven years; and (3) that the highly unsuitable location of the proposed site for school purposes, contrasting with its peculiar suitability and its greater value for commercial purposes, made it manifest that the condemning body had no bona fide intention to use the property for the purpose asserted but rather intended to hold it indefinitely until its appreciated value would permit it to be sold to private persons at great profit.

In other words, it was the purpose of the owners to establish a factual foundation to support their contention that although property may be acquired for future educational

needs (cf. Ed. Code, § 19577), this does not permit the acquisition of property by condemnation for purposes of speculation as a means of raising funds which thereafter may be used to purchase other property truly suitable for school purposes.

We need not undertake to evaluate the defense interposed by the allegations of the amended answers. (Cf. *Anaheim Union High School Dist.* v. *Vieira*, 241 Cal.App.2d 169 [51 Cal.Rptr. 94]. Petition for hearing denied.) It is sufficient for present purposes to observe that they presented substantial issues of law and fact. In many important respects, the instant case is similar to that presented to the court in *Port San Luis Harbor Dist.* v. *Port of San Luis Transp. Co., supra,* 213 Cal.App.2d 689, 693, in which the owners lost on the issue of public use, but, nevertheless it was held that the services of their counsel devoted to this issue were properly considered in determining the amount of the attorneys' fees to be awarded.

We, of course, do not question the asserted proposition that "It is certainly not debatable in the courts that the operation of a high school is for a public purpose." However, neither is it debatable that if a school board takes land under the guise of constructing a public school thereon but with the true intention of selling it thereafter to private parties for a profit, such a taking is not for a public use.

As pointed out in *People* v. *Chevalier, supra,* 52 Cal.2d 299, 304 et seq., it is only after it is established that the taking *is for a public use* that the conclusive presumption regarding *necessity and public good* is applicable. The court in *Chevalier* was at pains to point out at page 304: "There is no question, then, that the takings in the instant case are for a public use. Defendants did not allege fraud, bad faith, or abuse of discretion *in the sense that the condemner does not actually intend to use the property as it resolved to use it.*" This is exactly the contention upon which respondents based their defense in the instant case!

Since the available evidence relating to this issue is not in the record before us, we have no basis upon which to evaluate the defense grounded upon the allegation that appellant's taking of the property was for purposes of land speculation rather than for the construction of a school. But it is scarcely open to question that respondents were entitled to an adjudication of the issues tendered by this defense and if they had prevailed thereon they would have won the lawsuit. Therefore, even if the court below accepted the opinion of the one expert who testified on appellant's behalf that respondents

probably would not have prevailed in a trial, it still would not follow that the services of counsel in researching the law and discovering the evidence bearing upon those issues were noncompensable because they were ''not incurred in preparation for trial.''

In addition to the issue of public use, counsel for the respondent owners spent considerable time preparing for the scheduled trial on the question of value. They were successful in having the valuation date set more than a year after the date of service of summons, a not insignificant gain since it was conceded that the subject property was located in an area of rapidly rising property values. In addition, to the extent that their pretrial preparations produced evidence causing other community leaders interested in the proceeding to conclude that the condemning body's estimated costs of acquisition would prove grossly unrealistic, their endeavors may have contributed to the decision to abandon the proceeding, and this not merely to the advantage or respondents, but presumably to the advantage of the taxpayers of the school district.

The attorneys estimated their total time expenditures at 45 and 47 days, respectively, without any indication that this included any ''political'' or ''lobbying'' activities. The criticism directed to the time records kept by respondents' counsel appears to be unwarranted. As they reasonably explained, since their contracts with their clients provided for contingent fees, they had no reason to be concerned with such exact time records as would have been required if they had been operating on a time-price basis as did the office by whom appellant's sole expert witness was employed. In addition, at the rate of $50 per hour, the figure set by appellant's expert, the award was substantially justified on a time basis alone.

Appellant's expert testified that *he* would have charged respondents only $7,500 or $10,000 to handle the case to the date of dismissal because *he* would not have ''wasted his time'' in preparing to litigate the issue of public use or in seeking to demonstrate to the condemning body the error of its decision to condemn.[1] If respondents' counsel had followed this course, it is quite possible either that their clients

[1]It is to be noted, however, that appellant's expert (Mr. Hadley) indicated his recognition that services rendered in procuring an abandonment are compensable under the statute. He testified: ''Q. And did you take into consideration the success of obtaining an abandonment in this case in arriving at your fee? A. I took into consideration the legal contribution made in relation to the abandonment, yes.''

would have lost their land or that the proceeding would have been abandoned only after an extended trial had established the value of the land at a figure so high that the project could not reasonably have been carried to completion.

It is beyond serious question that the primary purpose of respondents was to defeat the action and thus to retain their property. In fact, on January 17, 1964, they had offered to waive all claims for costs and disbursements if the proceeding were to be then abandoned despite the fact they had contractually obligated themselves to pay their attorneys $100,000 upon the occurrence of such a contingency. In this regard it may be noted that respondents' attorneys in striving to establish the wisdom of abandoning the action were working against their own financial interests. That is to say, if a trier of the fact had fixed the fair market value of the property even at the lower figure earlier set by the inheritance tax appraiser, their contingent fee contracts would have entitled them to a fee in the approximate amount of $200,000.

■ "The determination of what is a reasonable fee is a question of fact that rests within the discretion of the trial court [citations], after it has considered a number of factors including '[t]he nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure of the attorney's efforts, the attorney's skill and learning, including his age and experience in the particular type of work demanded.' [Citation.]" (*La Mesa-Spring Valley School Dist.* v. *Otsuka, supra,* 57 Cal.2d 309, 316.)

■ It is implicit in appellant's basic contention, of course, that the trial court manifestly abused its discretion in evaluating the services of respondents' counsel. This contention is the basic foundation upon which appellant's entire case is necessarily constructed because, as we have shown, there is no finding of fact, no ruling on an objection to evidence, nor any other affirmative action of the trial court indicating that it relied on any improper consideration in reaching its decision.

■ On this subject of abuse of discretion, it is aptly stated in *Berry* v. *Chaplin,* 74 Cal.App.2d 669, 672 [169 P.2d 453] : "In a legal sense discretion is abused whenever in the exercise of its discretion the court *exceeds the bounds of reason,* all of the circumstances before it being considered." (Italics added.)

■ In the instant case, it cannot fairly be said that the

award "exceeds the bounds of reason." Inasmuch as the award made by the trial court is substantially less than the valuations indicated by the several expert witnesses ($100,000 to $120,000) who testified on behalf of respondents, it certainly cannot be asserted that the award is not supported by the evidence. The statement made by the court in *Stuart* v. *Preston*, 2 Cal.App.2d 310, 318 [38 P.2d 155, 39 P.2d 441], in connection with a similar problem is equally apposite here:

"There is no showing here that this verdict was the result of passion or prejudice. It is supported by the sworn testimony of reputable members of the bar. To hold that it is excessive (or so grossly excessive as to shock our consciences) we would have to find that all these witnesses swore falsely and that the trial judge refused to perform his duty. . . ."

■ In addition, of course, the trial judge is himself an expert in the matter of attorney fees. "'. . . "The value of attorney's services is a matter with which a judge must necessarily be familiar. When the court is informed of the extent and nature of such services, *its own experience furnishes it with every element necessary to fix their value*." [Citations.]'" (Italics added.) (*California Interstate Tel. Co.* v. *Prescott*, 228 Cal.App.2d 408, 411 [39 Cal.Rptr. 472].)

■ As aptly stated in *State of California* v. *Westover Co., supra*, 140 Cal.App.2d 447, 450: "[T]he appeal is not a trial de novo of the basic issue of reasonableness of the fee allowed. What constitutes a reasonable fee is and ought to be confided in the first instance to the trier of fact, the court called upon to make the allowance, and it matters not whether an appellate court sitting in review of the trial court's order finds itself in agreement with or differing from the amount so fixed. We can inquire only as to whether or not the sum allowed is so exorbitant that its allowance constitutes a palpable and plain abuse of discretion."

The order is affirmed.

Roth, P. J., concurred.

FLEMING, J. Dissenting.—The question before us is the award to defendants, on the abandonment of eminent domain proceedings, of their costs and disbursements and reasonable attorneys' fees incurred in preparing for trial and during trial.

From studying the briefs and the records I conclude:

1. The award of $77,000 in fees cannot be justified for the performance of strictly legal services.

2. The great bulk of services for which the award was made involved political representation and not legal representation.

3. The purported legal issue at stake—that acquisition of land for a high school was not for a public purpose—involved political (policy) argument advanced in political forums and not legal argument presented in court.

4. The court based its award of fees in substantial part on political services.

5. Because such services are not a proper basis for an award of attorneys' fees under section 1255a, the cause should be remanded to the trial court with instructions to assess fees against the school district for legal services only.

*1. The Award of $77,000 in Fees Cannot Be Justified for the Performance of Strictly Legal Services*

Court activity in this case was minimal.[1] Valuation activity was skeletal. Considered as a legal proceeding the cause had scarcely proceeded beyond the preliminaries before its abandonment. Neither counsel for defendants had kept any time records to substantiate his estimate of time spent on the case, nor did either counsel have any specific data to indicate what amount of time he had spent on any particular aspect of the case. The daybook of one of the counsel, brought to court at the request of plaintiff school district, indicated no more than a total of five days' work on the case.

In my view Mr. Hadley's estimate of the value of all legal services in the case at $7,500 to $10,000 was substantially correct.

*2. The Great Bulk of Services for Which the Award Was Made Involved Political Representation and Not Legal Representation*

The paucity of strictly legal services was recognized by counsel, who consequently emphasized the political nature of their services and the happy results achieved for their clients as a result of their services. In using the words political serv-

---

[1] Other than continuances, the record in the trial court shows only the following activity on behalf of these defendants:

30 October 1963—2-page answer filed
7 January 1964—opposition to plaintiff's motion for an early trial
27 January 1964—first pretrial conference
4 August 1964—2-page amended answer filed
11 September 1964—argument on date of valuation

Thereafter on 14 June 1965 a notice of abandonment was filed by plaintiff.

ices in no way do I derogate the services performed or belittle their merit. Perhaps the use of a neutral phrase, such as policy services, would avoid the connotation attached to the phrase political services and attached to the word lobbying. Nevertheless, under whatever label we choose to use and however described, these services appear to have been political and to have constituted the overwhelming bulk of the services performed by counsel in this matter. These were not legal services connected with the representation of defendants in court. As described at length by counsel, their services consisted in advising their clients how to defeat the proposal for a high school in the immediate area and how to persuade the new school board not to build a high school on their property. In addition to advising their clients on these matters, the attorneys themselves took an active role in publicizing views favorable to their clients' interest and persuading persons and institutions in the area to adopt their point of view. The mechanics of the campaign were—first to propose a division of the existing high school district into two separate parts (consolidating each separate part with the lower schools in the area), next to persuade the voters to approve this division, then to persuade the voters to elect school board members sympathetic to the interests of the defendants, and finally to persuade the newly elected school board members to abandon the condemnation. The basic arguments used by the attorneys in this campaign were that another high school in the district was not needed, and even if one were needed the particular location had been poorly chosen.

In this endeavor counsel were wholly successful, and the new school board determined in February 1965 to abandon plans for a high school on the Lautrup property. Both attorneys testified at length about their services. Mr. Baggot testified:

". . . we also checked with the Chamber of Commerce officials in the City of La Mirada and tried to develop what we knew was there, and that is an opposition to this taking for a school site. We felt that the City was against the taking, which they were, and we felt the Chamber of Commerce was against the taking, and they were, and we felt that all the help we could get from the City and Chamber of Commerce would perhaps rub off on the School Board and help to get this property abandoned as a school site, and we had a number of conferences in that connection, and we did a considerable amount of study in that connection, including some

report put out by the School Board. . . . Well, the City Manager of La Mirada was one of the men, and he informed us that the City was against the school going in there. I can't remember the name of the man. I don't think I have it down here that we met with from the Chamber of Commerce. We met with him in the morning. Then we went to lunch and discussed it some more. He was very much opposed to the school site and promised to help us all he could. I don't remember his name, though. . . .

A. Yes, there was a unification election, and then following that—which, as I understand, unification was voted in—and then there was an election for the board members of the unified district.

Q. And after the unification, was there a change in the superintendent of schools?

A. Yes.

Q. And there was a different school board, is that true?

A. Yes. . . .

"We raised these points regarding public use, and importuned the City officials and Chamber of Commerce officials and anybody else we could to assist to get the school board to back off this site, and did everything we could think of, both legally and politically, to save the property from condemnation.

Q. You stated on direct examination in support of your contention that your services were worth $50,000, that you saved the property from comdemnation is that correct?

A. That is one of the main factors, yes.

Q. Is it your contention that your activity is the sole and proximate cause for the abandonment in this case? . . .

"I think it was motivation because obviously the School District had to follow the notice of abandonment. We couldn't do that. But I think our efforts were the main reason for the abandonment."

In his declaration to support his fee Mr. Baggot asserted:

"One of the declarant's primary objectives in representing Minnie Margaret Lautrup herein was to secure an abandonment in this proceeding. Much of the time spent by declarant in this matter was devoted to the pursuance of this objective."

Mr. Atkinson testified:

"Now, when I finally got into the case, as I have said, after the negotiations between Mr. Norman Lautrup and the County Counsel's office broke down, I immediately began to

investigate the conditions in the area relative to the possibility of endeavoring to keep this property from being taken by condemnation. When we filed the answer, at that time we did not know the facts, but I contacted first of all Mr. Alex Googooian, who was the City Attorney of La Mirada, and he advised me that the City was up in arms about the taking of this piece of property, and he advised me to talk to Mr. Chapman Bone, who was the City Administrator, and to talk with the officials of the Chamber of Commerce, and to talk with the newspapers and various other people in the community to see what their feeling was with regard to this.

"And so I did talk with a number of these people and found that the City was very disturbed and very much opposed to the taking of this piece of property for the reasons that they felt: first, there was no need for the school because there was a school that was either just completed or was about to be completed in the general area; there was no expected substantial growth in the area insofar as residences were concerned because the area had already been built up; and because this was one of the last—probably the last remaining site which could be developed for a substantially beneficial use of the city; and, finally, because it was an extremely hazardous location for a school because it was right on the two main boulevards, which would eventually and even then had become —particularly Imperial had become extremely dangerous traffic-wise, and they urged me to do everything I could to see if the property could be kept from being condemned and offered to make all the information that they had available, and to assist in whatever way they could.

"Then, in the course of this, a number of consultations were held with these people. One—I think I remember one, in particular, where we spent the morning talking, and Mr. Baggot and I then went to lunch with them and then went further into the matter. In the course of this, I obtained from the Chamber of Commerce the study—this is where I first learned of it, from the La Mirada Chamber of Commerce—the study in future district planning of this particular district, which had been prepared by the University of Southern California by its four—one, two, three . . . six leading administrators there in the field of education, and then there was the survey staff, and they had made a specific study of the problems of this district. And I made a very extensive study of this report, and I came to the same conclusion that had been given to me by the City officials and by the Chamber of Commerce

that this was an absolutely ridiculous place for the location of this school. It was on the actual northerly boundary of the school district, and all of the growth was going—or a substantial portion of any growth was going to take place in the middle and even further below that toward the south of the district in what would be the Dairy Valley, Artesia area, because of the fact that that had been kept as dairies through the years by the forming of the City of Dairy Valley, where they restricted housing development, but everybody knew that that was changing. I, particularly, knew that that was changing because of the fact that the property taxes were becoming so extremely high that the dairymen could not continue to operate their dairies in that location. . . .

''The Court: You said they had three million dollars worth of unsold bonds?

The Witness: Yes, in excess of three million dollars' worth of unsold bonds, and it was bonded to 75 percent of its capacity, and here they were to build a school, they were going to have to— . . .

''I found that if they built this school, they were going to have to haul by bus children from the southern part of the district clear up to the very northerly line of their district to use its capacity, and even then, it probably wouldn't be used to capacity, and I found that they were even, as of then, doing some hauling to fill their other schools. So, as I said, after reviewing it, I was of the opinion that this was not a taking for public use, and that in my opinion, it was a taking of a very valuable piece of property, which I think they hoped—in my opinion, they hoped to get at a very unusual bargain price, and I came to the conclusion that I doubted if a school would ever be built there, and they would use it to trade for land in some other area, so that they could—because this was going to be a tremendously valuable piece of property. Now, in the course of things— . . .

''Q. Is it your estimate, then, you spent 48 hours on the telephone?

A. I would say that that is a conservative estimate because I talked to many, many people about this because we hadn't gotten into it. But after this election came up and the unification of this school district became a very vital issue, and we felt that if a proper school board could be elected that we would have a chance of getting an abandonment without having to litigate the question of public use, I spent many hours talking to a number of people and many hours with my client

advising him as to the thing to do to assist in this election, your Honor, and we participated very actively in that.

Q. Was this on the telephone?

A. A great portion of it was on the telephone, yes.

Q. You have no records to support that; this is just an estimate.

A. No, it is my best estimate.

Q. That is applicable to all your topics in your declaration, the times that you have are estimates only?

A. Well, yes, except on the court appearances. . . .

"You know, and from what has been testified, we worked together as a unit. He did certain things, I did certain things, and we combined our joint talents and joint ability to produce what we thought was an excellent result.

Q. You feel that you have the same reputation and standing in the field of comdemnation as Mr. Baggot does?

A. No. I don't think so, but I think I have other assets in this case that are equally as valuable and perhaps more so in this particular case, such as my knowledge of the property and conditions out there, and my ability to contact and get the information from the officials and to get their assistance and to know what was going on, and to particularly assist in stirring up this consolidation of the school district—unification of the school district and endeavoring to see that a board was elected that would be in favor of abandoning this case.

Q. Would you classify your efforts in this case as being more of a lobbyist rather than an attorney?

A. No, I acted strictly as an attorney. I advised my client as to what to do with regard to the political problems involved. . . .

Q. However, you contend it was through your efforts and Mr. Baggot's efforts that the action was abandoned, is that correct?

A. Well, being frank and fully fair, I don't think our efforts were the only efforts that contributed to this. The entire community was aroused over this situation. But I am sure that, Mr. Stewart, I know this, I know that the school— let me correct that. I know that the Chamber of Commerce and City had given up in this matter, and that when Mr. Baggot and I—when I particularly came in and started fighting on this thing, we aroused the whole thing all over again, and then a vehicle came along which made it possible for this to be unified and brought to the public's attention, and it was one of the key issues in the election of the new directors—not

'directors', but trustees of this school board, and I had my client, for example, Mr. Norman Lautrup, contact these people and find out their position, and then he backed and worked with the people in the community to try to see that people were elected that would vote for us, and I was guiding this and assisting in this. I talked to the Superintendent of Schools, Mr. Benton, myself. He was very much opposed to taking this site. . . .

Q. Who did you talk to in the La Mirada-Norwalk School District?

A. I talked to Mr. Benton, the Superintendent of Schools, at several times, discussing the entire problem, getting his cooperation and learning his position, and Mr. Lautrup also had a number of meetings with him at my suggestion.

Q. Is Mr. Benton a voting member of the Board of Education?

A. Well, under their setup, sir, he would not be a voting member, but as the head of the district, he certainly would have a great deal to say as to what would occur, and his recommendations are presented to the Board of Trustees, and I know given great weight. . . .

"This Reginald M. Benton is the Superintendent of Schools of the Norwalk-LaMirada City School District that I referred to originally in stating that I had held consultations with him in person and by telephone, and he is the man along with this Chamber of Commerce that I and Mr. Lautrup worked at great length with on this unification question, and on the political action that we took in the matter. Now, I personally talked to him, not only when the unification question came up, but when I was reviewing this 197-page report, which has been referred to, which was studied by the USC editors to be sure that the facts, as far as he could tell me over the telephone first relative to that, to the enrollment, was true because as was subsequently proven to be correct, when the School Board had a chance to vote on it, there was just absolutely no need for the school in that location, and the study showed it and the facts I got from Mr. Benton showed it, and that convinced me. . . .

"And I had obtained details on all of the parties that were running for the election to the school board, and I had the brochure that was out, and I discussed with Mr. Benton what his attitude would be in the event this unification took place, and he told me that in his opinion, there was absolutely no need for this school, and that if the unification took place that

he was going to recommend against the construction of the school, and he said although he could not advise us what to do, but that he would be very glad to see a school board elected that would follow his recommendation, and I then—well, that is something else.

Q. What did you do next then?

A. Then I discussed at length with Mr. Lautrup the parties that were running, and he, at my direction and under my instructions, interviewed a number of these directors—not 'directors,' but the persons running, and, in fact, interviewed Mrs. Aegerter, whom we had actually taken the deposition of before, and he and I discussed how she should be interviewed, and what should be said to her to determine what her position would be, and we also discussed having him interview her husband, which he did do, and the same thing occurred with regard to Mr. MacTaggart and several of the other persons that were running.

"And after determining their attitude, he and I then consulted further, and then he, along with the assistance of the Chamber of Commerce, the newspapers—I would report our position to the newspapers so that they could publish articles relative to the fact that there was no need for this school, and it was discussed with Mr. Chapman Bone by me and by him that even though the Planning Commission had approved this site—because if there would have been condemnation, a fixed decision at that point, that they were very much opposed to this, and they would rezone it. And so at the instigation of Mr. Chapman Bone, the City Administrator, I discussed it with the local newspaper, the Lamplighter, and they wrote articles on it, and the question of the stand of the people running, as we worked on, became the material issue in this whole election, and it is interesting—not 'interesting', but it turned out that the part that we worked on was successful the first time, in other words, the unification of that part was successful, your Honor, which was testified to here, and the part where we didn't work, which was what was going to be left after this part was unified, was not successful the first time. They had to go through it all over again.

And Mr. Benton worked with me and with Mr. Lautrup in trying to accomplish this. Then when it was finally accomplished, Mrs. Aegerter had changed her position, was elected to the new board. Mr. MacTaggart was elected to the new board, and he recommended just what he told us he would recommend. And the school board then did—the new school board

did then elect to abandon or recommend it be abandoned by the old school board, and the old school board had to—in effect, followed that, and there was a great deal of work done by me talking to Mr. Hurley, who was very active over there, Mr. Helms, who was very active over there, and the City Attorney, and naturally, I even talked to Mr. Hutchison, although frankly at the moment, I don't remember what it was about, I can't remember that. . . .''

In his declaration Mr. Atkinson stated:

''At the time declarant was employed, he was instructed that he was to take all means legally available to endeavor to secure an abandonment of the above-entitled action, and it was expressly understood and agreed orally between declarant and Norman Lautrup that the first primary objective in representing him in the matter was to endeavor to secure the School District's abandonment of the case. As will appear from the further facts set forth in this declaration, a great deal of the time spent and work done by declarant in this case was devoted to securing the objective of the abandonment of the proceedings by the School District.''

In arguing to the court the value of their services both Mr. Baggot and Mr. Atkinson stressed the fact that they had succeeded in persuading the newly elected school board in the newly created district to abandon the condemnation. Mr. Atkinson stated:

''. . . the desire of the parties was to save this property, if possible, from condemnation. Now, that becomes a very important thing, and our actions went—from that time on—went to that point a great deal, and that is shown by the extensive research, for example, that I did on this study, so that I could get the facts with which we then questioned in the deposition, and then all of the work that I did with regard to the City Council, the Chamber of Commerce, the newspapers, the political thing with the School District, Mr. Benton, who was the head of it—and none of this is disputed— and all this went toward the abandonment, and this abandonment just didn't accidentally happen. I will admit there is some question of fortunate circumstances which came along—we don't deny it—which assisted us, and that was—this problem of unification came up, but the whole battle—and this has not been disputed—one of the main battles was the taking of this school site and the necessity of putting a school there, and that was the issue, as I have testified to. That is the whole thing. And who stirred that up? Mr. Lautrup and myself.

458

Because the City had already by their Planning Commission given up and approved the site, but it became such an issue that this board was elected, and then the two people that had testified under the directions of—not, say, 'directions,' but with Dr. Miller, the superintendent of the Excelsior School District that had testified as to the necessity of this thing, reversed themselves and were entirely in accord with what I and Mr. Baggot had been arguing from the very beginning, that this whole thing was not justified by the fact and was not in truth the taking for public use, and that was a very vital issue, and we fought it from the very beginning and went along with that. . . .

'Now, how much were our services worth in the political field, shall we call it? I mean it wasn't truly political in one sense. It was taking advantage and stirring up a community so that an issue became very vital. It is almost impossible to measure that in dollars and cents. But you cannot escape the fact that those actions on our part and in my directing of our client caused this whole thing to come about. . . .

"We worked on the unification. Mr. Stewart has said the unification was a crucial factor. Certainly, the unification had a substantial bearing upon this, and we both worked on that, Mr. Atkinson in particular. We worked not only on the unification, your Honor, which was one election, but worked on the board elections that followed the unification election. There were two districts involved here. There were three unification elections, one in one district and two in another, and they were followed by board elections, and Mr. Atkinson worked on those, trying through his contacts and friends in the area and through Mr. Lautrup as well, to work and try to get elected those members who were in favor of abandonment of this school site."

Mr. Baggot stated:

"We worked on the unification elections, worked on the board elections and did everything possible, and I particularly have reference to Mr. Atkinson's efforts here, although I did participate in a number of them to get this thing abandoned. . . .

"You can call it 'lobbying' or whatever you want. I don't care what you call it. It isn't 'lobbying' in the sense that I was trying to pass any bill through. But I was trying to arouse within the community and within the officials that could do something about it the fact that this was not a taking for a public use at all, and that there was—although there was a conclusive presumption—there was no necessity for it."

**3.** *The Purported Legal Issue at Stake—That Acquisition of Land for a High School Was Not for a Public Purpose— Involved Political (Policy) Argument Advanced in Political Forums and Not Legal Argument Presented in Court*

The thrust of counsel's argument against a high school on the Lautrup property was not that the operation of a high school did not involve a public purpose, but that as a matter of policy the high school was not needed at the time, its location was poorly selected, and perhaps a high school would never be needed at that particular location. To support this argument reference was made to population statistics, future growth in the area, and the like. Clearly these are arguments of policy properly addressed to the policy-making body and improperly addressed to a court in legal proceedings relating to condemnation. It is certainly not debatable in the courts that the operation of a high school is for a public purpose. Where a high school should be located, whether the district can afford to build another high school, whether there should be five or six in the district, etc., are matters committed to policy-making bodies over which the courts have no jurisdiction. This case differs from *State of California* v. *Westover Co.,* 140 Cal.App.2d 447 [295 P.2d 96], in which counsel were reimbursed for arguing public purpose, in that *Westover* involved a condemnation of land for a wild life sanctuary under relatively new statutory authorization, at that time a public purpose considerably more debatable than the operation of a public high school has ever been.

**4.** *The Court Based Its Award of Fees in Substantial Part on Political Services*

As we have seen from the extracts of the record, the lack of substantiation for strictly legal services caused counsel to place great emphasis on their political representation in the case. Not only may we infer from the paucity of the showing of legal services that the trial court gave weight to these claims but we have the statement of the court itself that it considered such services an important factor in the case:

"The Court: In the line of results, Mr. Baggot, I am interested in the point that Mr. Stewart is raising here, that is what is there in the record in this case that you feel constitutes evidence that the services of the counsel for the defendants, yourself or Mr. Atkinson, or both of you, were an effective factor in bringing about the abandonment?

"Mr. Baggot: Well, your Honor—

"The Court: *That is an important factor.*

"Mr. Baggot: That is a very important factor, obviously, and gets us into the labyrinth of cause and effect." (Italics added.)

5. *Because Such Services Are Not a Proper Basis For an Award of Attorneys' Fees Under Section 1255a, the Cause Should Be Remanded to the Trial Court With Instructions to Assess Fees Against the School District for Legal Services Only*

In vacating the present award of fees against the school district, in no way would we limit counsel's right to collect for their services or would we downgrade the value of political and policy-influencing services performed by lawyers. The sole issue here is whether under section 1255a the school district is required to reimburse the Lautrups for moneys spent for such services. Under my reading of the statute reimbursement for attorneys' fees is limited to fees incurred in preparing for the trial of the condemnation proceedings and may not include fees for political and policy-influencing services. While the matter has not been directly passed upon by the Supreme Court, the language in *La Mesa-Spring Valley School Dist.* v. *Otsuka,* 57 Cal.2d 309, 315, 316, 318 [19 Cal. Rptr. 479, 369 P.2d 7], strongly implies such a limitation:

"The value of all services rendered *in preparation for trial* after the complaint was filed are clearly recoverable. The question is whether the value of such services for such purpose, rendered prior to the filing of the complaint, is recoverable, if reasonably necessary in preparing for the expected trial . . . The fees recoverable must be *a reasonable incident of the suit,* proximately and directly resulting from the action . . .

"Of course, the defendant cannot recover any fees of his attorney incurred in connection with the proposed taking of his property unless such fees were incurred in preparation for the defense of the action. It is only those *services rendered in preparation for trial* of the proposed action that are recoverable. It is for the trial court to determine what services were rendered *in preparation for trial* and the reasonable value of such services." (Italics added.)

I would reverse.

A petition for a rehearing was denied February 26, 1969. Fleming, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied April 2, 1969.