[No. D000553. Fourth Dist., Div. One. Sept. 30, 1985.]

SALTON BAY MARINA, INC., et al., Plaintiffs and Appellants, v.
IMPERIAL IRRIGATION DISTRICT, Defendant and Appellant.

916

918

924

**COUNSEL**

Sutherland & Gerber, Lowell F. Sutherland, Neil Gerber and Michael L. Rood for Plaintiffs and Appellants.

Jennings, Engstrand & Henrikson, Wallace R. Peck, Paul D. Engstrand, McInnis, Fitzgerald, Rees, Sharkey & McIntyre and Horton, Knox, Carter & Foote for Defendant and Appellant.

## OPINION

**STANIFORTH, Acting P. J.**—After granting of plaintiffs' petition for review (and denial of defendant's) the California Supreme Court retransferred the cause to this court "for reconsideration in light of *Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790." After due reconsideration, we reissue the cause conformable to the principles enunciated in *Redevelopment Agency* v. *Gilmore, supra*.

Defendant Imperial Irrigation District (the District or IID), in its management of water diverted from the Colorado River for irrigation purposes within its boundaries in Imperial County, uses the Salton Sea Basin as a repository for irrigation runoff waters. Plaintiffs Salton Bay Marina, Inc., et al.[1] (Marina or plaintiffs) own land, homes and businesses surrounding the Salton Sea. Their properties have been flooded, damaged by the rising waters of the Salton Sea.

Marina originally filed suit on December 21, 1976, against the District and Coachella Valley Water District in the United States District Court for the Southern District of California, seeking damages for the flooding of its properties on theories of inverse condemnation, negligence, nuisance and trespass. They filed an identical "protective" complaint in Imperial County Superior Court on January 13, 1977. On March 1, 1980, Marina entered into a settlement agreement with Coachella Valley Water District. On July 2, 1980, during pretrial hearings pursuant to a request by IID, the federal district court invoked the doctrine of abstention on the ground of predominance of state law questions and ordered the case be remanded to Imperial County Superior Court.

Trial was bifurcated and separate juries were impaneled to hear liability and damages issues. The liability phase lasted from February 24 to March

---

[1] Plaintiffs are: Salton Bay Marina, Inc., Salton Bay Marina Trailer Park, Inc., Walter and Mary Ann Southard II, dba Salton Bay Marina Boathouse; Helen Burns, dba Helen's Harbor & Beach House; George F. Beaty, Lavern Beaty, Leo R. Newell, Dorothy Newell, Milton Sutherland and Mildred Sutherland, dba Salton Sea Beach Marina; M. M. E. Corp. and Boyd F. Thomas, dba Marina Mobile Estates; James and Marie P. Brannon; Marie P. Brannon, dba Brannon Mobile Trailer Park; John and Victoria C. Swartz, dba Palms Motel and Mobile Park; Ona and Pearl Stuart; Paul and Barbara Shuberg; Neil Johnson; Hubert and Lola Baker; Elmer E. Plum; Patrick L. and Mary E. Moore; James C. Moore; Robert H. Nygaard; James and Gladys Kuzmicki; Bernard R. Philbrook, dba Desert Shores Trailer Park and Marina; Robert Brady Grannillo, dba Bob's Playa Riviera; Alva R. and Jeanette M. Wallace; Jacob A. and Barbara J. Dumelle; Clyde F. Jones; Richard F. Bringle, dba Bombay Marina; Earl Bringle; James and Maryann Thomas; Kenneth and Ardis Lea; Joseph D. and Clementina Geimer; J. Wilson Bilyeu and Doris Ann Bilyeu; John O. Gustafson; Louis A. Troutman, Jr.; Horace M. Depew; Mildred P. Bowman, Trustee of the Johnson Family Trust; Arthur Ray Qualls; Jeannette Fadler; and Dorothy Robinson Meister.

12, 1981. The jury found flooding was caused by the District's negligence and constituted a nuisance and taking of property. On appeal,[2] the District does not dispute there was substantial evidence to support the jury's findings but argues it was shielded from liability by agreements signed by Marina or its predecessors-in-interest which allowed the District to flood its property.

The damages phase began on January 14, 1982, and was completed on March 3, 1982. Only 11 jurors deliberated because both alternates had been put on the panel and the 12th juror was excused by the court. The jury awarded damages of $6,959,336. On appeal, the District contends it was wrongfully denied a 12-person jury and the court erred in its instructions as to valuing Marina's property.

Following the trial, Marina requested litigation costs and a permanent injunction. The trial court granted attorney and expert fees and costs but denied the injunction. Marina appeals the denial of the injunction. The District appeals the amount of attorney fees, costs and interest awarded, as well as the trial court's not providing for flooding easements in the final judgments in favor of the District and in ordering the District to deposit the judgment amounts pending appeal.

### FACTS

The Salton Sea was formed between 1905 and 1907 when the Colorado River flowed through a levee break into the Salton Basin, an area almost entirely below sea level. The basin's lowest point is 273.5 feet below sea level. The Salton Sea is now maintained primarily by return flow of water from IID (approximately 1.25 million acre feet annually). The Salton Sea also receives water from the Coachella Valley Water District (approximately 120,000 acre feet), the Mexicali Valley in Mexico (approximately 100,000 acre feet) and natural washes (approximately 10,000 acre feet). Rain and ground water contribute an additional 8 percent normally.

In 1927, the United States Geological Survey conducted a study to determine the probable future extent of the Salton Sea based on development of all irrigable acres in the Imperial Valley (805,000), the Coachella Valley (98,000) and the Mexicali Valley (253,000). The survey predicted the sea

---

[2]The District has dismissed its appeal as to the following plaintiffs: Horace M. Depew; Jeannette Fadler; Clyde F. Jones; Kenneth and Ardis Lea; Patrick L. and Mary E. Moore; Paul and Barbara Shuberg; Dorothy Robinson Meister; James C. Moore; Arthur Ray Qualls; Joseph D. and Clementina Heimer; Ona and Pearl [Stuart]; Bernard R. Philbrook; Jacob A. and Barbara J. Dumelle; and Louis A. Troutman, Jr.

would stabilize at the minus 224-foot level. As a result of the survey, the federal government withdrew all government lands below the minus 220-foot contour from settlement.

After 1927, the District engaged in a program of buying private lands below the minus 230-foot level. It spent approximately $350,000 before abandoning the project in the 1930's. The District now owns about 134,000 acres near or under the Salton Sea in Riverside and Imperial Counties.

Imperial County permitted development around the Salton Sea but required property owners to absolve the county and the District from liability for the Salton Sea's rising. Before 1957, this was accomplished through written agreements with property owners. After 1957, the requirement was codified into an ordinance requiring property owners to grant the District a flooding easement before they could obtain a building permit.

From 1964 to 1974, the Salton Sea level stabilized largely due to a water conservation plan initiated by the Secretary of the Interior in order to fill the Glen Canyon dam. Under the program, the District was required to reduce its demand for water by 10 percent. The District allowed its farmers only 10 percent waste and reduced the amount of water supplied to farmers who exceed this amount. During this period, the Salton Sea stabilized at about the minus 231-foot level.

During the 1970's, the District changed its management practices. It increased the waste water allowance to farmers from 10 percent to 15 percent of the water delivered to farmers. Under the "13-Point Program" adopted in 1976, the District no longer enforced water conservation by reducing the water supply to farmers who wasted water in excess of the permitted amount, but rather, supplied all water ordered and initiated a triple-charge for waste water above 15 percent. During this period, the homes, businesses and properties of Marina were flooded by rising waters of the Salton Sea.

A study covering the period from 1967 to 1976 shows 1,132,000 acre feet of the 2,543,000 acre feet the District delivered to farmers was deposited in the Salton Sea. An expert testified a reasonable amount would have been 250,000 acre feet. Of the 1,132,000 acre feet deposited into the Salton Sea, 84 percent (951,000 acre feet) was essentially fresh water which had never soaked into a farmer's fields but had either run across the surface of the fields into a collection ditch (tailwater) or had run through the District's canals and overspills (spillwaste). The amount of spillwaste was 556,509 acre feet, or 20 percent of the total amount the District delivered to its farmers. The general manager of the District testified 5 percent (127,150

acre feet) would be a reasonable amount for operational spill. The District's water manager also testified the District's canals should not reasonably spill more often than once every 10 days or twice a month. Marina produced evidence showing the canals were spilling much more frequently.

DISCUSSION

I

FLOODING RIGHTS

All but one of the plaintiffs or their predecessors-in-interest either (1) entered into a written agreement as a condition of subdivision approval by Imperial County "not to sue" the District and not to hold the District "responsible in any manner whatsoever for any damage or injury caused or occasioned by the rising of the Salton Sea," (2) granted an easement to the District for "a perpetual right to overflow, flood or pond water resulting from changes in the level of the Salton Sea, upon and across any and all part or parts" of plaintiffs' property up to the minus 220-foot level in exchange for a building permit from Imperial County, or (3) in one case, agreed to release the District from liability in a lease of the District's property.

The District argued these easements and agreements were valid and precluded plaintiffs' recovery for flood damage to their property caused by the District. Marina argued the easements and agreements were adhesionary contracts and void for want of consideration and for violating the public policy against waivers of liability. The District asserts the trial court erred in ruling, as a matter of law, the agreements and easements did not relieve the District from the flooding of the land covered by the documents and erred in allowing extrinsic evidence to alter the plain meaning of the documents. Marina asserts the trial court never declared the easements and agreements were invalid but only ruled they were not, in themselves, a bar to an action based upon negligent operation or the deposit of excess waters into the sea. This apparent confusion over what the trial court ruled can be understood by examining the record.

The trial court's ruling on this matter spans nearly 1,800 pages of transcript. Before trial, the court ruled the easements and agreements did not bar Marina's recovery and seemed to construe the documents as shielding the District from recovery only if the flooding was due to natural causes. Later, during trial when the court overruled Marina's objection to the District's introduction of an agreement and Marina sought the basis for the trial

court's decision, the court responded "helpfully" "I don't have to explain it. I just make the ruling. I think it's part of the total picture." Just before the evidence was introduced, the court made equally "helpful" comments to the jury. The court first explained it had ruled the documents did not bar Marina from bringing the lawsuit and then added: "Now, what the legal effect of this will be, will be dependent upon you and will be reflected in your verdict later on . . . . I am not saying that they do or do not preclude the parties from bringing this action. We will take a look at the whole picture and you will decide what the legal effect of it is, or rather what the actual effect of it is. I will reserve the legal effect to myself, but let's go ahead from there."

While discussing jury instructions with counsel, the court stated its opinion the jury could find the parties entered into the agreements and easements with their eyes wide open in which case agreements or easements would preclude recovery. Finally, the court instructed the jury: "Many of the plaintiffs in this case signed documents called 'flooding easements,' which purport to absolve the County of Imperial and the Imperial Irrigation District from all liability for the damage in the event of a rise in the level of the Salton Sea. Now these documents do not necessarily absolve the defendant from liability. You may consider, however, the fact of their execution on the state of mind of the plaintiffs at that time and give it such weight as you deem proper on the defendant's claim that the plaintiffs' negligence contributed to their own injury.

"In assessing the weight to be given to such evidence, you must keep in mind all of the other instructions that I have given you on the issue of negligence. A flooding easement can be permitted to burden the land of another. The extent of an easement is determined by the terms of the grant or the nature of the enjoyment by which it was acquired. All contracts which have further objects, directly or indirectly, to exempt anyone from responsibility from his own fraud or willful injury to the person or property or another or violation of law, whether willful or negligent, or [sic] against the policy of the law."

In sum, it appears the trial court ruled the easements and agreements (1) did not, as a matter of law, preclude Marina from bringing suit against the District and (2) could, as a factual matter, preclude Marina from recovery, diminish their recovery because of showing their own negligence, or could be unenforceable as against public policy. By their verdict the jury concluded the agreements and easements did not preclude recovery and evidence did not show Marina negligent.

A. *Agreements*

On June 18, 1956, Imperial County entered into three identical agreements with property owners in the Bombay Beach area of the Salton Sea. These agreements provided, in relevant part: "[S]aid Bombay Beach Tract is located at and adjoining the Salton Sea in the County of Imperial, which said Salton Sea at times rises in such a manner as to flood and partially inundate portions of said tract; . . . .

" . . . . . . . . . . . . . . . . . . . .

"[I]n consideration of the premises, the Parties of the First Part [the property owners] hereby covenant for themselves, their heirs, successors and assigns, *not to sue the Party of the Second Part [Imperial County], its officers or employees, nor the Imperial Irrigation District, a public corporation, nor to hold said Second Party, its officers or employees, nor said Imperial Irrigation District responsible, in any manner whatsoever, for any damage or injury caused or occasioned by the rising of the Salton Sea, or any flooding or inundation of any portion of the said Bombay Beach Tract by said Salton Sea,* now owned by said Parties of the First Part." (Italics added.)

These agreements were recorded. Of the plaintiffs remaining on appeal, two signed this agreement.

The fundamental canon of the interpretation of a written instrument is the ascertainment of the intent of the parties. (Civ. Code, § 1636; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665].) Generally, the language of the instrument must govern its interpretation if it is clear and explicit. (Civ. Code, § 1638.) The words of the instrument are, generally, to be understood in their ordinary and popular sense. (Civ. Code, § 1644.) How the parties label their instrument does not necessarily determine its nature. (*County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 691 [119 Cal.Rptr. 491, 532 P.2d 139].)

Conformable to the cardinal rule in interpreting an agreement, we look first to its language. We conclude the agreement's language is ambiguous. It fails to specify the type of flooding contemplated, e.g., flooding by natural causes or by the District's deliberate or negligent acts.

When the language used in an instrument is ambiguous, extrinsic evidence may be introduced to clarify the ambiguity. (Code Civ. Proc., § 1856.) Relevant extrinsic evidence includes the circumstances which ex-

isted at the time the written instrument was made (Civ. Code, § 1647) and the construction given to it by the acts and conduct of the parties with knowledge of its terms before any controversy has arisen as to its meaning. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co., supra,* 20 Cal.2d 751, 761.) When the determination below rests upon a resolution of conflicting evidence, then the reviewing court must uphold the trial court's determination if it is supported by substantial evidence. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co., supra,* 20 Cal.2d 751, 761.)

■ Extrinsic evidence on this issue was introduced and was in conflict. The District presented evidence tending to show since 1927 the District anticipated flooding the Salton Sea Basin up to the minus 220-foot level and the agreements were entered into to protect the District and Imperial County from liability when that eventuality occurred. Marina's evidence, on the other hand, tends to show agreements were not intended to absolve the District from liability for negligently flooding their property.

Plaintiffs testified when they entered the agreement, they understood the agreement to preclude recovery only for flooding due to natural causes. Further, later acts of the parties tend to support this conclusion since Marina built permanent improvements on their property with the consent and acquiescence of Imperial County and the District.

Since the language of the agreement was ambiguous and the jury, upon substantial evidence, resolved the conflict in the extrinsic evidence in favor of Marina, we are bound by its determination. Thus we conclude the agreement's intent was to preclude liability from flooding due to natural causes.

This result is equally compelled by the rules of law governing the interpretation of clauses attempting to limit liability for negligence. ■ The language of an agreement in order to exclude liability for negligence must be "clear and explicit" and "free of ambiguity or obscurity." (*Conservatorship of Link* (1984) 158 Cal.App.3d 138, 143 [205 Cal.Rptr. 513].) The law generally looks with disfavor on attempts to avoid liability or to secure exemption for one's own negligence. (*Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 518 [105 Cal.Rptr. 904].) The law requires exculpatory clauses to be strictly construed against the party relying on them. (*Id.,* at p. 519.)

■■ ■■■ For an agreement to be construed as precluding liability for "active" or "affirmative" negligence, there must be express and unequivocal language in the agreement which precludes such liability. (*Vinnell Co.* v. *Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411, 414-415 [340 P.2d

604];[3] *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40, 48-49 [41 Cal.Rptr. 73, 396 P.2d 377].) An agreement which seeks to limit liability generally without specifically mentioning negligence is construed to shield a party only for passive negligence, not for active negligence. (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd., supra,* 147 Cal.App.3d 309, 317-318; *Celli* v. *Sports Car Club of America, Inc., supra,* 29 Cal.App.3d 511, 518-519; *Basin Oil Co.* v. *Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 595 [271 P.2d 122]; see also *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628, 633 [119 Cal.Rptr. 449, 532 P.2d 97].)

The agreements here fail to specifically exclude liability for active negligence in causing flooding. Thus these rules of law as well as the resolution of conflicting extrinsic evidence compel the conclusion the agreements precluded liability only if due to natural causes and not if due to the District's own active negligence.

The District contends a construction limiting the agreement's scope to flooding due to natural causes makes "no sense whatsoever" since "IID never had control or legal responsibility for natural causes" and such a construction would render the agreements "meaningless and interpreted in a manner that defeat[s] the express purpose . . . which was to permit IID to use plaintiffs' land to deposit IID's water."

When interpreting a written agreement, the courts are required to avoid an "absurd result" (Civ. Code, § 1638), however, the courts are also required to give a construction which is lawful (Civ. Code, § 1643). While the District argues our interpreting the agreement to shield the District only from liability for naturally caused floods is an absurd result, we conclude if we were to construe the agreement as desired by the District, then we would reach an unlawful result for then the agreement would be an illegal exculpatory contract violating the public policies discussed in II *infra.* Under either view, the agreements do not shield the District from liability in this case.

B. *Lease Agreement*

In December 1958, the District leased 50 acres to plaintiffs Southards which they used to develop a marina and recreation area. The lease was negotiated by attorneys. In pertinent part, the lease provides:

---

[3]*Vinnell Co.* v. *Pacific Elec. Ry. Co., supra,* 52 Cal.2d 411, involves an indemnity provision but cited, without comment, cases involving exculpatory provisions. Later cases have expressly held the general rules of construing indemnity provisions apply to exculpatory clauses (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 318 [195 Cal.Rptr. 90]; *Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 519 [105 Cal.Rptr. 904].)

"10. *Release and Indemnity*

"(a) As and for part of the consideration for this Lease, Lessee hereby *releases and forever discharges Lessor [IID], its successors and assigns, from any and all liability of whatsoever kind or nature arising out of any injury to, or destruction of, the property of Lessee located in or upon the demised premises whether due to the negligence of Lessor, its successors or assigns, due to changes in quantities of water in Salton Sea, or otherwise.*

". . . . . . . . . . . . . . . . . . . . . . . .

"21. *Salton Sea Flooding Easement*

"Lessee acknowledges that the leased premises are subject to flooding easement in favor of Lessor [recorded Feb. 11, 1958, in Book 985 at page 623, Official Records of Imperial County]. As and for part of the consideration for this Lease, Lessee hereby releases and forever discharges Lessor, its successors and assigns from any and all liability of whatsoever kind or nature *arising out of any injury to, or destruction of, the property of Lessee or either of them located in Section 9, Township 10 South, Range 10 East, S.B.B. & M., whether due to the negligence of the Lessor, its successors or assigns, due to changes in quantities of water in the Salton Sea, or otherwise.*" (Italics added.)

■ The language of this lease agreement is clear and explicit and shows an intent the District be exculpated from all liability for flooding due to the rising of the Salton Sea "*whether due to the negligence*" of the District "*or otherwise.*" As we shall show subsequently, these clauses are against public policy and therefore void.

C. *"Easements"*

In 1957, Imperial County enacted the following ordinance: "THE BOARD OF SUPERVISORS OF THE COUNTY OF IMPERIAL, STATE OF CALIFORNIA, DO ORDAIN AS FOLLOWS:

"Section 1. It shall be unlawful for any person, firm, or corporation to erect or construct, or cause to be erected or constructed, or to alter or cause to be altered, any building, structure, or improvement below the minus 220 foot contour along any portion of the Salton Sea in said County, without first obtaining a written permit therefor as hereinafter provided.

"Section 2. No permit shall be issued for any of the purposes designated in Section 1 of this Ordinance unless and until the applicant therefor has

executed a flooding easement, to run with the land upon which such building or alteration will be performed, the same to run in favor of the County of Imperial and the Imperial Irrigation District.

"Section 3. The County Engineer is hereby designated as the county officer to be in charge of the issuance of said permits.

"Section 4. Every day on which work of any nature is performed in connection with the erection or alteration of any building, structure, or improvement without the permit provided for in Section 1 hereof shall constitute an independent violation of this Ordinance.

"Section 5. This Ordinance is hereby declared to be passed, adopted, and approved by the Board of Supervisors of the County of Imperial under and by virtue of the constitutional police powers of said Board of Supervisors and of said County.

"Section 6. Any person violating any of the provisions of this Ordinance shall be guilty of a misdemeanor, and upon conviction shall be punishable by imprisonment in the County Jail not to exceed six months or by a fine not to exceed $500.00, or by both such fine and imprisonment.

"Section 7. The Clerk of the Board of Supervisors is hereby ordered to publish this ordinance in the manner required by law, and said Ordinance shall be in full force and effect at the expiration of thirty days from and after its passage and before the expiration of fifteen days shall be published with the names of the members voting for and against the same once in the Holtville Tribune, a newspaper of general circulation, published and circulated in the County of Imperial, State of California.

"Passed, adopted, and approved this 24th day of October, 1957."

Pursuant to this ordinance, the following document, with insignificant variations, was executed by the various landowners: "GRANT AND CONVEY to IMPERIAL IRRIGATION DISTRICT, an irrigation district existing under the laws of the State of California, and to the COUNTY OF IMPERIAL, a political subdivision of the State of California, a perpetual right to overflow, flood or pond water, resulting from changes in the level of Salton Sea, upon and across any or all part or parts or portions of those certain premises situated in the County as follows: to wit: so much of the following property as lies below the minus 220-foot contour level. [Property description.] THE BURDEN of this grant of easement to run with the land hereinabove described in perpetuity. THE SOLE PURPOSE of this grant of easement is to absolve gran-

tees from future liability for any damages to the property above described, and improvements hereinafter made on it arising out of changes in the level of the Salton Sea, and grantor does hereby so absolve them and each of them.''

The language of this document is ambiguous. On the one hand, the document purports to convey an easement to the District "to overflow, flood or pond water . . . upon and across any or all part or parts" of Marina's property "as lies below the minus 220-foot contour level." On the other hand, the document asserts "THE SOLE PURPOSE *of this grant of easement is to absolve grantees from future liability for any damages to the property . . . and improvements.*" (Italics added.) Thus, the document inconsistently seeks to create an easement, an interest in land, but then states the document is solely intended to limit future liability.

The subsequent acts of the parties are also inconsistent with the intent of creating an easement to flood Marina's property. All the parties participated in development of the property: The District participated by obtaining the "easements," a precondition to issuance of building permits; Imperial County by issuing building permits; and the Marina by building. The acts of encouraging and allowing development of the property are clearly inconsistent with an intent to flood the property. (Compare *Security Pac. Nat. Bank* v. *City of San Diego* (1971) 19 Cal.App.3d 421 [97 Cal.Rptr. 61], where this court upheld a grant of flooding rights across *undeveloped* property.)

This court is required to give "great weight" to the conduct of the parties in interpreting the instrument before any controversy arose. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co., supra,* 20 Cal.2d 751, 761.) Since evidence on this point is essentially undisputed, we conclude the documents were not intended to create easements.

Nor do we agree with the District's contention the ordinance requiring "easement" agreements effected valid dedications pursuant to Imperial County's police power. A regulatory body may constitutionally require a dedication of land as a condition of development and such a dedication requirement is not viewed as an act of eminent domain. (*Associated Home Builders, etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 638-640 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847]; *Georgia-Pacific Corp.* v. *California Coastal Com.* (1982) 132 Cal.App.3d 678, 699 [183 Cal.Rptr. 395].) However, there are limitations on the government's power to require a dedication. The dedication requirement must be reasonably related to the use of the property as viewed in light of

its impact on the surrounding community (both in the present and the future) and its impact on the general welfare of the community. (*Associated Home Builders, etc., Inc.* v. *City of Walnut Creek, supra,* 4 Cal.3d 633, 639; *Bringle* v. *Board of Supervisors* (1960) 54 Cal.2d 86, 89 [4 Cal.Rptr. 493, 351 P.2d 765]; see also Gov. Code, § 65909; *Ayres* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31, 38 [207 P.2d 1, 11 A.L.R.2d 503].) Additionally, any government action, including a dedication requirement, which deprives the owner of all reasonable use of his property amounts to a taking of property which must be compensated.

 In reviewing whether an ordinance constitutes a valid exercise of the police power, the courts look to see if (1) its object is a proper governmental objective, and (2) the means chosen reasonably relate to that objective. (*Silver* v. *City of Los Angeles* (1963) 217 Cal.App.2d 134, 139 [31 Cal.Rptr. 545].)

 The District asserts Imperial County's dedication requirement promoted "the general welfare and needs of the community whose only water disposal area was the Salton Sea drainage reservoir" and was a reasonable accommodation between the plaintiffs' interest in using and developing their property and the future peril of flooding.

Regulation of land within a flood plain is encouraged. (See the Cobey-Alquist Flood Plain Management Act (Cobey-Alquist Act), Wat. Code, § 8401, subds. (c), (d); Batchelder, *Flood Plain Zoning in California—Open Space by Another Name: Policy and Practicality* (1973) 10 San Diego L.Rev. 381, 388 (hereinafter *Flood Plain Zoning*).) The effects of flooding—loss of life and property, disruption of commerce, transportation, communication and the life of the community—are recognized as detrimental to the health, safety, welfare and property of the people of California. (Wat. Code, § 8401, subd. (a); *Flood Plain Zoning, supra,* at p. 381.) Accordingly, the Cobey-Alquist Act authorizes local governments to restrict development of property located within a flood plain (see Wat. Code, § 8410) and California courts have upheld these regulations as a valid exercise of the police power. (See *Helix Land Co.* v. *City of San Diego* (1978) 82 Cal.App.3d 932, 945 [147 Cal.Rptr. 683]; *Turner* v. *County of Del Norte* (1972) 24 Cal.App.3d 311, 315 [101 Cal.Rptr. 93].) In those cases there was a rational relationship between the goal of protecting people and property from loss caused by flooding and the adoption of regulations restricting the type of development within the flood plain area. The same cannot be said of Imperial County's ordinance.

Imperial County's requirement a landowner dedicate all or part of his property to the District for flooding purposes fails to further the goal of

protecting people and property from loss due to flooding. Indeed, the "dedication" requirement, tied to the issuance of a building permit, has just the opposite effect. It encourages economic loss by permitting development of property with a use incompatible with the dedication requirement. The "dedication" requirement here does not reduce the threat of loss but merely shifts the burden of it. An ordinance whose function is to shift liability for loss away from a negligent party is not an ordinance justified by the health, safety or general welfare of the public.

Moreover, since potentially all of a landowner's property might have to be dedicated in order to obtain a building permit, the requirement could act to deprive a landowner of *all* use of his property since the District would be using the property to store water. As such, the ordinance acts as a subterfuge for a taking of property without just compensation and the courts will not enforce it unless that compensation is paid. (See *Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 462 [327 P.2d 10].)

We conclude language of the "easement" documents and extrinsic evidence show the document was not intended to create an easement or dedication of an interest in land but rather an exculpatory clause.

## II

As noted previously, the "easement" itself states "THE SOLE PURPOSE of this grant of easement *is to absolve* grantees from *future liability* for damages to the property . . . and improvements . . . arising out of changes in the level of the Salton Sea." (Italics added.)

Additionally, as shown by a resolution of the board of directors directing the district attorney to draft the ordinance, Imperial County's intent was to avoid liability. The resolution, in pertinent part, states: "WHEREAS, it has been the practice in the past to obtain easements covering the flooding and overflowing of private lands before subdivisions were approved in order *to protect the County and the Imperial Irrigation District from lawsuits or other legal action* due to the rise or fall of the Salton Sea." (Italics added.)

While no public policy prohibits private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise place on the other party, under Civil Code section 1668, all contracts affecting the public interest which have for their object, directly or indirectly, to exempt anyone from responsibility for his own negligence or injury to the person or property of another are against public policy and void. (*Tunkl* v. *Regents of University of California* (1963) 60

Cal.2d 92, 95 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].) 
Although the California Supreme Court has recognized "[n]o definition of
the concept of public interest can be contained within the four corners of a
formula" (*id.*, at p. 98), the court has reviewed a number of factors that
should be considered in identifying the kind of agreement in which an ex-
culpatory clause is invalid as contrary to public policy: " '[1] It [the agree-
ment] concerns a business of a type generally thought suitable for public
regulation. [2] The party seeking exculpation is engaged in performing a
service of great importance to the public, which is often a matter of practical
necessity for some members of the public. [3] The party holds himself out
as willing to perform this service for any member of the public who seeks
it, or at least any member coming within certain established standards. [4]
As a result of the essential nature of the service, in the economic setting of
the transaction, the party invoking exculpation possesses a decisive advan-
tage of bargaining strength against any member of the public who seeks his
services. [5] In exercising a superior bargaining power the party confronts
the public with a standardized adhesion contract of exculpation, and makes
no provision whereby a purchaser may pay additional fees and obtain pro-
tection against negligence. [6] Finally, as a result of the transaction, the
person or property of the purchaser is placed under the control of the seller,
subject to the risk of carelessness by the seller or his agents.' " (*Henrioulle*
v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 518 [143 Cal.Rptr. 247, 573
P.2d 465], quoting *Tunkl* v. *Regents of University of California, supra,* 60
Cal.2d 92, 98-101, fns. omitted.)

 Here, the lease, agreements and easements fall squarely within
the parameters established by the Supreme Court.

The agreements here involve both development of land and management
of water, areas which are extensively regulated. (See Gov. Code, § 65000
et seq.; Wat. Code, §§ 20500 et seq., 22840 et seq.) Both the District and
Imperial County are public entities performing vital public services. The
power to grant building permits for the properties involved here lies solely
with Imperial County. Because the county required plaintiffs to obtain a
waiver of liability from the District before the county would issue permits,
the District shared the county's power in granting building permits and was
placed in a very strong bargaining position. As conceded by the District,
the "easement" and other agreements were standardized, the easement
agreements containing only "minor variations," the agreements being iden-
tical. There was no evidence indicating Marina bargained for the terms of
the agreements or that they could develop their property as permitted by the
zoning other than by executing documents prepared by the District. Marina
presented evidence establishing the District paid no consideration for exe-

cution of the agreements. As a result of signing the agreements, plaintiffs' property, developed in accordance with the county's requirements, was put at risk of being completely submerged due to the District's negligence without any recourse against the District or the county.

The exculpatory agreements here scrutinized, including the lease agreement, violated these further express public policies.

The District has a mandatory duty to avoid wasting water and to prevent flooding. The California Constitution requires "the water resources of the State [to] be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented." (Cal. Const., art. X, § 2.) This same language prohibiting waste or unreasonable use or unreasonable method of use of the state's water resources is also found in Water Code section 100.

As we quoted in *Elmore* v. *Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 193 [205 Cal.Rptr. 433]: " '[E]veryone must admit that the purpose of the constitutional amendment [now art. X, § 2] was to vest with a public interest the use of all the waters of the state, so that no part of the precious supply should flow uselessly into the sea or otherwise go to waste. This characterization applies to flood waters as well as to the normal flow.' " (Quoting *People of the State of California* v. *United States* (9th Cir. 1956) 235 F.2d 647, 663.)

Since the District has a duty to avoid wasting water and to prevent flooding, then it follows an agreement seeking to exempt the District from liability for doing exactly that which the policy of the law forbids is contrary to public policy and void.

### III

 ██ ██ In face of this constitutional and statutory duty, the District contends—even if the county's requirement was unlawful—Marina should have challenged the validity of the flooding rights agreements before accepting building permits by a petition for a writ of mandate and since they did not, they are now precluded from raising the issue.[4]

---

[4]The District also argues plaintiffs are barred by the statute of limitations since Marina's remedy was to seek a writ of mandate at the time the ordinance was enacted and the conditions imposed and Marina failed to do so within the applicable statute of limitations. In civil actions, the statute of limitations is a personal privilege and must be affirmatively asserted or it is deemed waived. (*Minton* v. *Cavaney* (1961) 56 Cal.2d 576, 581 [15 Cal.Rptr. 641, 364 P.2d 473]; *Getz* v. *Wallace* (1965) 236 Cal.App.2d 212, 213 [45 Cal.Rptr. 910].) Since the District failed to assert this statute of limitations defense below, the defense is deemed waived.

██ Generally, a landowner who accepts and complies with the conditions of a building permit cannot later sue the issuing public entity for inverse condemnation for the cost of compliance. (*County of Imperial* v. *McDougal* (1977) 19 Cal.3d 505, 510 [138 Cal.Rptr. 472, 564 P.2d 14]; *Pfeiffer* v. *City of La Mesa* (1977) 69 Cal.App.3d 74, 76 [137 Cal.Rptr. 804].) Instead, the property owner is generally limited to having the condition invalidated by a proceeding for writ of mandate. (See *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 128 [109 Cal.Rptr. 799, 514 P.2d 111].)

██ The reasoning behind this rule was stated by the California Supreme Court in *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 276 [157 Cal.Rptr. 372, 598 P.2d 25]: "'. . . [T]he legislative body assesses the desirability of a program on the assumption that compensation will not be required to achieve the objectives of that ordinance. Determining that a particular land-use control requires compensation is an appropriate function of the judiciary, whose function includes protection of individuals against excesses of government. But it seems a usurpation of legislative power for a court to force compensation. Invalidation, rather than forced compensation, would seem to be the more expedient means of remedying legislative excesses.' [Citations.]" (See also *Air Quality Products, Inc.* v. *State of California* (1979) 96 Cal.App.3d 340, 352 [157 Cal.Rptr. 791]: "meaningful governmental fiscal planning would be impossible and legislative control over appropriations emasculated if persons were permitted to simply stand by in the face of administrative action claimed to be unlawful and injurious and years later assert substantial monetary damages.")

Thus the rule a landowner seek to invalidate the condition by writ of mandate rather than seek compensation by inverse condemnation is designed to avoid forcing an unwanted taking of property by the public entity and concomitant burden of compensation when the landowner has previously accepted conditions and benefits of development.

The rule, however, has no relevance and should not be applied in this case. First, since the requirement here involves an unlawful agreement which is contrary to public policy and unlawful, the agreement is void *ab initio* (see *City of Los Angeles* v. *Morgan* (1951) 105 Cal.App.2d 726, 733 [234 P.2d 319]) and would entail requiring the court to uphold an unlawful agreement, a result disfavored.

Second, the rule should not apply when the intent of the ordinance is to not merely regulate the development of land or to require a reasonable

dedication but to effectuate a taking of land without payment of compensation as would be the case here.

 Third, the rule, the District asserts, rests upon the doctrine of estoppel. (See *County of Imperial* v. *McDougal, supra,* 19 Cal.3d 505, 511.) Before the doctrine may be applied, it is necessary the condition's effect be readily apparent to the party to be estopped. Otherwise, it cannot truly be said a landowner accepted the condition as the price of obtaining the right to develop his or her property.

 In the California cases and cases cited by the Supreme Court in *County of Imperial* v. *McDougal, supra,* 19 Cal.3d 505, 511, the conditions were readily apparent and had an immediate impact. (*Id.,* condition on special use permit allowing commercial sales of water prohibited sales of water outside county; *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, condition of building permit required dedication and improvement of street; *Edmonds* v. *County of Los Angeles* (1953) 40 Cal.2d 642 [255 P.2d 772], condition on "conditional exception" limited number of trailer spaces; *Pfeiffer* v. *City of La Mesa, supra,* 69 Cal.App.3d 74, condition on building permit required dedication of easement and construction of storm drain; *Psyhogios* v. *Village of Skokie* (1972) 4 Ill.App.3d 186 [280 N.E.2d 552], condition on variance permitting landowner to convert a building to a restaurant required landowner to raze building for parking; *Zweifel Manufacturing Corp.* v. *City of Peoria* (1957) 11 Ill.2d 489 [144 N.E.2d 593], condition on variance for building used for auto sales required front area be landscaped and not be used for parking cars; *Skipjack Cove Marina, Inc.* v. *County Commissioners* (1969) 252 Md. 440 [250 A.2d 260], conditions on "special exception" related to boundary line and access easement; *Stevenson* v. *Palmer* (1969) 223 Tenn. 285 [448 S.W.2d 67], condition on building permit required a brick wall be built around apartment complex.)

In contrast, here, the building permit condition was unclear in its scope and extent and had no readily apparent immediate impact, whether as a condition relating to naturally caused flooding or as a waiver of liability in case of future flooding uncertain as to when if ever it should occur. Under these circumstances, *where the condition concerned only a future possibility, landowners should not be estopped from seeking damages by inverse condemnation once the actual taking occurs.*

*In Mehl* v. *People* ex rel. *Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 717 [119 Cal.Rptr. 625, 532 P.2d 489], it was held the damage must be sufficiently appreciable to a reasonable man before the statute of limitations

period begins to run. In *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 119-120, and *Rancho La Costa* v. *County of San Diego* (1980) 111 Cal.App.3d 54, 61 [168 Cal.Rptr. 491], involving challenges to the adoption of a general plan showing a public use of private property (a street in *Selby,* a park in *Rancho La Costa*), the courts held an inverse condemnation action was premature because a general plan by its nature was tentative and subject to change. Finally, in *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 173 [188 Cal.Rptr. 104, 655 P.2d 306], the Supreme Court explained *"[t]he primary concern expressed in Selby was that courts not be drawn into disputes which depend for their immediacy upon speculative future events."* (Italics added.) (See also *Olson* v. *County of Shasta* (1970) 5 Cal.App.3d 336, 341 [85 Cal.Rptr. 77] (flooding caused by an intense storm) where the court noted: "The very definition of a 'taking' requires an 'act' [citation], and the risk of future flooding is not an act.") The possibility of flooding here was tentative and subject to change as the District changed its management practices. The elements necessary to give rise to an estoppel are not present.

## IV

### NUMBER OF JURORS

■ The District next contends the trial court erred in allowing only 11 jurors to decide the damages issue. Originally, there were 12 jurors plus 2 alternates selected for the damages phase. The parties initially estimated this phase would last four to five weeks. By the time jury deliberations were to begin, some six weeks later, both alternates had been seated and the trial court had excused one of the jurors. Marina asserts the District is barred from raising this issue on appeal because of failure to make timely objection to the court's excusing one juror. The District argues its objection was timely.

Under the California Constitution, a civil jury "shall consist of 12 persons or a lesser number agreed on by the parties in open court." (Cal. Const., art. I, § 16; see also Code Civ. Proc., § 194.)

The constitutional provision is based on the 1861 Supreme Court decision of *Gillespie* v. *Benson* (1861) 18 Cal. 409. (*Meder* v. *Safeway Stores, Inc.* (1979) 98 Cal.App.3d 497, 504 [159 Cal.Rptr. 609]; see also Code Commissioners' Notes to Code Civ. Proc., § 194.) In *Gillespie,* the court held: "[A party's] failure to appear at the trial operated as a consent on his part that the issue should be tried by the Court without a jury. The defendants could have made this consent mutual by submitting the case to the Court;

but as they did not choose to take that course, and called for a jury, they were bound to take the number required by law. Twelve is that number, and a less number will not constitute a legal jury without the consent of the adverse party. Such consent must be express, and entered at the time in the minutes of the Court. It cannot be inferred from the mere absence of the adverse party." (*Gillespie* v. *Benson, supra,* 18 Cal. 409, 411.)

Thirty years later, in 1890, the Supreme Court in *Hitchcock* v. *Caruthers* (1890) 82 Cal. 523 [23 P. 48], discussed the issue of a jury of less than 12 persons in a civil case and summarily disposed of the contention reversal was required. The Supreme Court stated: "Appellant asks for a new trial, because it appears that the case was tried with only eleven jurors. But we will not presume the extraordinary spectacle of a court compelling a party to go to trial against his consent with less than twelve jurors upon a record which not only fails to show any objection or exception on the point, but which does state that 'a jury of eleven persons was regularly impaneled and sworn to try said action.'" (*Id.,* at p. 526.)

In addition to the Supreme Court cases, there are two Court of Appeal opinions. The first, *Woods* v. *Pacific Greyhound Lines* (1949) 91 Cal.App.2d 572, 574 [205 P.2d 738], decided in 1949, found plaintiffs' attorney had expressly stipulated in open court to the court excusing one juror and submitting the cause to the remaining eleven. The *Woods* court stated: "A party may not deliberately consent to excuse a juror who has been sworn, and to submit the cause to the remaining 11 jurors, speculating on a favorable verdict, and then, after an adverse verdict has been returned, for the first time challenge the lack of 12 jurors." (*Id.,* at p. 574.) The court also noted 10 of the remaining jurors had voted for the verdict which was returned. (*Ibid.*)

In the last case, *Meder* v. *Safeway Stores, Inc., supra,* 98 Cal.App.3d 497, the jury consisted of only six persons. There was no stipulation to a jury of less than 12 persons in open court and entered into the minutes. The *Meder* court found this was error but went on to hold appellant was estopped from raising the issue on appeal because he had stipulated in chambers to a jury of six persons.

▮▮▮▮ These cases establish the principle that the adverse party's *silence alone* will not constitute a waiver of the right to a 12-person jury. However, a party may be precluded from complaining on appeal of a lesser number if the party (1) stipulated to a lesser number, whether or not in open court or (2) failed to enter timely objection to a jury of less than 12. ▮▮▮▮ We conclude, as did the trial court, despite being given numerous opportunities

to object to a jury of less than 12, the District failed to object timely or to raise any objection until it was too late.

Here, during voir dire, trial was estimated to run thirty days, four days a week for a total of about five weeks. Apparently before the jury was sworn, juror number 12, Grace Taylor, in unreported proceedings informed the court she had planned a Caribbean cruise beginning February 26. The court told her that would not be a problem. Neither counsel disagreed with the court's statement to Taylor.

By February 10, both alternates had been placed on the panel and thus the possibility there might not be 12 jurors to decide the case became a reality.

On February 16, nearly five weeks into the trial, the court reminded counsel of Taylor's impending vacation, the court's intention to excuse her and asked counsel what they wanted to do. The District at that time estimated it had five days of evidence to put, thus indicating it would finish its case on Wednesday, February 24 (no trial occurred on Friday), which would leave only one day before Taylor's vacation began for all closing arguments, instructions, deliberations and the reaching of the verdict. Thus, at this time it was clear there would be less than 12 jurors to decide the case. Counsel did not object and proceeded to try the case in face of the court's explicit preannounced intent to release the juror.

On February 24, the trial court again mentioned the problem of Taylor's vacation. The District's response was to suggest starting a half hour early on Thursday, February 25, the last day before Taylor's vacation. The court rejected this suggestion as offering no solution to the problem and asked the jury to come back on February 25 at 9:30 a.m. When the jury left, the following occurred:

"THE COURT: So that I want to know what—what do you want to do with regard to it? You have two alternatives. One is to go with 11 jurors and the other is to declare a mistrial.

"MR. SUTHERLAND [counsel for Marina]: Or wait until she got back.

"THE COURT: I gave you your two alternatives.

"MR. ENDEMAN [counsel for the District]: I don't think—

". . . . . . . . . . . . . . . . . . . . . . . .

"The Court: . . . Now, here we are down to the wire, and we're two weeks overtime, and we're still going. So as I've indicated to you, gentlemen, all during the last couple of weeks here, as this matter got—as this day grew closer, she's going to be excused. There's no way I'm going to deny that woman the right to continue on her trip. So that I'm, right now—you're down to the alternatives. The case is taking two weeks longer than it should have, and either we can all blame—point the finger at somebody else, and that's not going to solve our problem.

"Mr. Sutherland: I'll go with 11.

"Mr. Endeman: Well, I—may I propose one alternative, that is, wait until tomorrow night to find out? In other words—

"The Court: I'm going to wait until tomorrow night.

"Mr. Endeman: I don't think we have to make a decision this minute.

"The Court: That's fine. Are we all aware of the fact of what our problem is?

"Mr. Sutherland: Painfully.

"The Court: All right. Then we'll wait until tomorrow night." Thus, on February 24, the District was presented with another opportunity to object to a less-than-12-person jury by moving for a mistrial but chose instead to not object and to proceed.

The next day, the District did not inform the court of its decision. Rather, the parties presented their closing arguments to all the jury and instructions were read. The court then excused Taylor as it had informed counsel it would. As the court was thanking Taylor, the District's counsel suggested Taylor deliberate with the other jurors for two hours—the time remaining that day. The court rejected this suggestion as unrealistic. In this fact context, *the District counsel remained silent, made no further suggestions or objections nor in any way indicate it objected to a jury of less than 12 until after Taylor had, presumably, left the courtroom and was no longer under the control of the court.*

This silent acquiescence continued until after the court informed jurors they would have instructions and exhibits with them in the jury room until after the bailiff was sworn in, until after the jury was told they would retire to the jury room and until after the verdict forms were given to the court.

The following then occurred:

"Mr. Endeman: Your Honor, we have a problem, now, that's arisen.

"The Court: Just one?

"Mr. Endeman: Well, one big one, and that is that I don't believe we're willing to stipulate to go with 11 jurors.

"The Court: You want to make a motion for mistrial?

"Mr. Endeman: Yes.

"The Court: I'm going to deny it. I'm going to deny it on this ground, that I specifically brought this up last week, to enable you to make a decision on the thing. You've continued to this point. So I'm going to rule that we proceed.

"Now, I'm fully aware of the implications of what I'm doing, but I'm still going to do it.

"Mr. Endeman: I thought we'd go through this evening.

"The Court: You've got it on record.

"Mr. Endeman: Sure."

Thus, the record shows even when the court was excusing Taylor, the District did not object but only made an impractical suggestion that she deliberate with the other jurors for the remaining two hours.

In *People* v. *Thornton* (1984) 155 Cal.App.3d 845, 856 [202 Cal.Rptr. 448], the court in discussing whether a judge could recall a jury who had been discharged, observed: "*Regardless* of whether and why the discharge may be erroneous, it results in sending the jurors back to the outside world freed of all the admonitions that previously guarded their judgments from improper influences. Once freed, the jurors can properly discuss the case with the district attorney and the People's witnesses, they can read about it in the media and they can entertain 'facts' or opinions about it from any source. . . . Once control is lost it would be fatuous to treat the case as if the discharge were merely a fiction. The conclusion is inescapable that a discharge accompanied by loss of control of the jury divests the court of jurisdiction to reconvene them whether or not a complete verdict was rendered and whether or not any error occurred at all. To conclude otherwise would pose 'an unacceptable risk of interference with duly rendered ver-

dicts.' (Cf. *People* v. *Romero, supra,* 31 Cal.3d 685, 689 [183 Cal.Rptr. 663, 646 P.2d 824].)"

The reasoning of *Thornton* applies equally to this case. Once Taylor was excused and had left the courtroom, she was no longer in the court's control and was "freed of all the admonitions that previously guarded [her judgment] from improper influences." (*Thornton, supra,* at p. 856.) It was necessary for the District to enter its objection before the court lost control over her. The District allowed her to be discharged without objection. The District cannot now complain on appeal.

## V

### DAMAGES

■ The District next contends the court erred in permitting Marina's property to be valued without regard to enhancement caused by presence of the Salton Sea.

■ The measure of damages in inverse condemnation, as in eminent domain actions, is "market value." (*Tilem* v. *Los Angeles* (1983) 142 Cal.App.3d 694, 707 [191 Cal.Rptr. 229].) "Market value" generally refers to the highest price on the date of valuation agreed to by a seller, willing to sell but under no particular urgent necessity for so doing, nor obliged to sell, and a buyer, ready, willing, and able to buy but under no particular urgent necessity for so doing, each dealing with the other with full knowledge of all uses and purposes for which the property is reasonably adaptable and available. (*Id.,* at pp. 707-708; *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 43 [104 Cal.Rptr. 1, 500 P.2d 1345]; *Sacramento etc. R.R. Co.* v. *Heilbron* (1909) 156 Cal. 408, 409 [104 P. 979]; Code Civ. Proc., § 1263.320, subd. (a).)

■ However, it has also been recognized that the market value on date of valuation may not reflect the true value of property because of actions by the public entity. (See, e.g., *San Diego Land etc.* v. *Neale* (1888) 78 Cal. 63, 74 [20 P. 372] (designation of plaintiff's property as possible reservoir site increased value); *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 51-52 (precondemnation activity by public entity decreased value).)

The leading California case on "project enhancement" in condemnation cases is *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478 [93 Cal.Rptr. 833, 483 P.2d 1]. In *Merced* defendant owned property adjoining a lake which was to be improved with a project for recreational purposes.

The district sought to acquire from defendant 189 acres, 117 of which were known to be in the project earlier and 72 acres which were thought to be outside the project until 1975 when it appeared they would eventually be taken. The Supreme Court stated: "Inclusion of 'project enhanced value' in compensation is essential if, in accordance with the above principle, the reasonable evaluations of landowners are to be met. In a situation in which the government decides, some time after the initial completion of a project, that expansion of the project is necessary, 'just compensation' would clearly require that a condemnee, who had previously purchased his property at an increased price in the expectation that he would be near the improvement, should be compensated for 'full' market value, including the increment paid for 'project enhancement.' (See 4 Nichols on Eminent Domain (3d ed. 1962) § 12.3151[3], pp. 210-211.) Since these owners purchased the property at the enhanced value, we could hardly justify the exclusion of this 'enhanced' value from compensation if their property is ultimately taken." (*Id.,* at pp. 494-495; fn. omitted.) The court concluded "increases in value, attributable to a project but reflecting a reasonable expectation that property will not be taken for the improvement, should properly be considered in determining 'just compensation.' " (*Id.,* at p. 495.)

 This concern is also reflected in Code of Civil Procedure section 1263.330, concerning valuation in eminent domain cases: "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following:

"(a) The project for which the property is taken.

"(b) The eminent domain proceeding in which the property is taken.

"(c) Any preliminary actions of the plaintiff [public entity] relating to the taking of the property."

The questions of whether particular property is within or without a project and whether a property owner had a reasonable expectation his or her property would be taken for the project are factual matters. Here there was a conflict in the evidence presented. On the one hand, the District presented evidence showing the "project," the Salton Sea, was intended to cover all land in the Salton Sea Basin up to the minus 220-foot level and plaintiffs were given notice of this through flooding easements and agreements and thus could have no reasonable expectation their property was not within the "project." On the other hand, plaintiffs presented evidence showing they did not reasonably expect their property to become part of the District's project, and they paid for the property at its enhanced value.

This factual conflict was resolved against the District when the jury in the liability phase found plaintiffs were not negligent in building where they built and their recovery was not precluded by the easements and agreements. These determinations by the jury necessarily support the conclusion Marina did not reasonably expect their property was within the District's "project" at the time they purchased their property. The trial court did not err in permitting Marina's property to be valued as lake front property.

## VI

### FEES AND COSTS

The District next contends the court erred in determining the amount of costs and fees for the attorneys and experts.

■ Allowance of expert witness and attorney fees is not required by the "just compensation" clause of the Constitution, but rather lies within the discretion of the Legislature. (*Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 658 [131 Cal.Rptr. 646, 552 P.2d 430]; *County of Los Angeles* v. *Ortiz* (1971) 6 Cal.3d 141, 148-149 [98 Cal.Rptr. 454, 490 P.2d 1142, 68 A.L.R.3d 538].)

The Legislature has provided for fees and costs in Code of Civil Procedure section 1036. Under section 1036, in a successful inverse condemnation action: "[T]he court . . . shall determine and award or allow to such plaintiff, as a part of such judgment . . ., such sum as will, in the opinion of the court or such attorney, reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding."
■ Determination of amount of fees and costs is within the sound discretion of the trial court. (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86, 104 [160 Cal.Rptr. 733, 603 P.2d 1329], cert. den. 449 U.S. 820 [66 L.Ed.2d 22, 101 S.Ct. 77]; *County of Madera* v. *Forrester* (1981) 115 Cal.App.3d 57, 65 [170 Cal.Rptr. 896].) The owner is not necessarily entitled to compensation for the value of attorney services according to the owner's own notion or to the full extent claimed by the owner. (See *City of Los Angeles* v. *Waller* (1979) 90 Cal.App.3d 766, 780 [154 Cal.Rptr. 12]; *Excelsior etc. School Dist.* v. *Lautrup* (1969) 269 Cal.App.2d 434, 443-444 [74 Cal.Rptr. 835]; *Cal. Interstate Tel. Co.* v. *Prescott* (1964) 228 Cal.App.2d 408, 410-412 [39 Cal.Rptr. 472].)

Here, plaintiffs entered into a contingency fee contract with their attorneys for 40 percent of the total damages recovered if Marina went to trial. On

this basis, they sought attorney fees of approximately $4,285,500. Marina presented evidence at the attorney fees hearing that such an agreement was reasonable and widely used. The District presented two expert witnesses who testified a reasonable fee would be $725,000 to $750,000 but conceded contingency fee arrangements are not unusual in this area. In its brief, the District, based on Marina's attorneys' listing of hours spent and hourly rates normally charged, arrived at a figure of about $241,000.[5] The District's figure of $241,000 is based on multiplying the hours by the rate for the attorneys (Sutherland, Gerber, Bohlander, Ober, Rood and Larsen) and excluding the others as secretaries or paralegals. ▮ We think, however, necessary support services for attorneys, e.g., secretarial and paralegal services, are includable within an award of attorney fees.

The trial court found "the one third contract is a standard contract" and analogized the fee award "to the manner in which fees are set in probate." The trial court did not follow the contingent fee agreement. Rather, it calculated the amount of attorney fees on each verdict as 40 percent of the first $100,000, 35 percent of the next $100,000, 30 percent of the next $200,000, 25 percent of the amount between $500,000 and $1 million and 20 percent of any amount over $1 million.[6] This resulted in a total attorney fee award of about $2,984,000.

### A. *Propriety of Award of Attorney Fees*

▮ The District asserts Marina is not entitled to recover any attorney fees because Code of Civil Procedure section 1036 allows an award if there has been a "taking" of an interest in real property and here Marina's property was only "damaged." This assertion is meritless.

---

[5]This statement by Marina's attorneys read:

"SALTON SEA PROPERTY OWNERS VS. IMPERIAL IRRIGATION DISTRICT

| | | | | |
|---|---|---|---|---|
| "LOWELL F. SUTHERLAND | 1212.8 | hours | at | $125.00 |
| "NEIL GERBER | 60.4 | hours | at | 85.00 |
| "RICHARD BOHLANDER | 1.4 | hours | at | 80.00 |
| "NORMAN OBER | 14.5 | hours | at | 60.00 |
| "GERALD SUMMERS | 967.9 | hours | at | 75.00 |
| "GINGER MCNEES | 372.6 | hours | at | 50.00 |
| "BRENDA HAWK | 151.5 | hours | at | 45.00 |
| "KAY ROLLAND | 1520.0 | hours | at | 50.00 |
| "MICHAEL ROOD | 604.8 | hours | at | 60.00 |
| "KARLA ANGULO | 562.7 | hours | at | 45.00 |
| "CHRISTOPHER LARSEN | 719.3 | hours | at | 65.00 |
| "SUSAN VARGA | 68.3 | hours | at | 60.00 |
| "ARTHUR FEINGOLD | 11.0 | hours | at | 50.00" |

The total fees reflected here amounts to $444,768.

[6]The court excluded all damages due to emotional distress in its computation of the amount of attorney fees.

First, the definition of "taking" as used in section 1036 includes a more expansive concept of taking than set forth in the Constitution. (*Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144, 154 [148 Cal.Rptr. 640, 583 P.2d 165] (deprivation of an easement of access); *Holtz* v. *San Francisco Bay Area Rapid Transit Dist.*, *supra*, 17 Cal.3d 648, 654 (withdrawal of lateral support).) The California Supreme Court has observed the phrases "taking" and "damaging" have been used interchangeably. (*Holtz*, *supra*, 17 Cal.3d 648, 655, fn. 5.)

Second, here, the District did not merely damage the properties involved but rather took actual possession of them for storage of its waters. In *Orme* v. *State of California* ex rel. *Dept. Water Resources* (1978) 83 Cal.App.3d 178, 185 [147 Cal.Rptr. 735], it was held: "[W]hen a public agency causes injury to property by subterranean or surface flooding, even though the flooding is temporary in nature only, a taking of property within the meaning of Code of Civil Procedure section 1246.3 (now § 1036) occurs and litigation costs are recoverable." (Fn. omitted.) Accordingly, Marina was entitled to litigation costs including attorney fees under Code of Civil Procedure section 1036.

## B. *Propriety of Contingency Fee Award*

 The critical dispute here centers on the method for determining a reasonable attorney fee. Marina argues the court should determine reasonableness by looking at the actual fee arrangement between the client and attorney. The District argues, like attorney fee awards in public interest litigation, the court should determine reasonableness based upon time spent, a reasonable hourly rate and other factors such as the contingent nature of the case, its complexity and the extent the case prevented the attorney from working on other matters.

 California case law does not provide a definite answer to this question since California courts in condemnation actions, inverse or otherwise,[7] have sometimes (1) awarded fees based on a contin-

---

[7]Attorney fees are allowed for inverse condemnation (Code Civ. Proc., § 1036), in eminent domain actions where the condemner's offer was unreasonable and the condemnee's demand was reasonable (Code Civ. Proc., § 1250.410) and when the condemnation action was abandoned by the condemner (Code Civ. Proc., § 1268.610). All these sections rest on the policy a landowner who has been unnecessarily required to litigate because of governmental action relating to taking of private property should be reimbursed for his or her litigation costs. (See *Blau* v. *City of Los Angeles* (1973) 32 Cal.App.3d 77, 88-89 [107 Cal.Rptr. 727] (inverse condemnation); *Los Angeles County Flood Control Dist.* v. *Mindlin* (1980) 106 Cal.App.3d 698, 714 [165 Cal.Rptr. 233] (condemnation—unreasonable offer/ reasonable demand); *Pacific Tel. & Tel. Co.* v. *Monolith Portland Cement Co.* (1965) 234 Cal.App.2d 352, 358 [44 Cal.Rptr. 410] (abandonment of condemnation).) Therefore, the cases awarding attorney fees under these other statutes are instructive in determining the propriety of a fee award in an inverse condemnation action.

gency fee agreement (see *Lake County Sanitation Dist.* v. *Schultz* (1978) 85 Cal.App.3d 658, 663, 674 [149 Cal.Rptr. 717]; *Parker* v. *City of Los Angeles* (1974) 44 Cal.App.3d 556, 567 [118 Cal.Rptr. 687]); (2) denied an award of fees because the contingency of the contingent fee arrangement failed to occur (*Franklin-McKinley Sch. Dist.* v. *Lester* (1963) 223 Cal.App.2d 347, 348-349 [35 Cal.Rptr. 727]; *City of Los Angeles* v. *Welsh* (1935) 10 Cal.App.2d 441, 443 [52 P.2d 296]; *City of Long Beach* v. *O'Donnell* (1928) 91 Cal.App. 760, 762 [267 P. 585]; (3) have ignored a contingent fee agreement (see *County of Madera* v. *Forrester, supra,* 115 Cal.App.3d 57, 65); (4) have considered a contingent fee agreement as a factor (see *Glendora Community Redevelopment Agency* v. *Demeter* (1984) 155 Cal.App.3d 465, 470, 477-478 [202 Cal.Rptr. 389]; *Vella* v. *Hudgins* (1984) 151 Cal.App.3d 515, 519 [198 Cal.Rptr. 725]); or (5) have awarded fees based upon a consideration of time spent and other factors (see *La Mesa-Spring Valley Water Co.* v. *Otsuka* (1962) 57 Cal.2d 309, 316 [19 Cal.Rptr. 479, 369 P.2d 7]; *Redevelopment Agency* v. *First Christian Church* (1983) 140 Cal.App.3d 690, 707 [189 Cal.Rptr. 749]; *County of Madera* v. *Forrester, supra,* 115 Cal.App.3d 57, 65-66; *San Gabriel Valley Water Co.* v. *City of Montebello* (1978) 84 Cal.App.3d 757, 769 [148 Cal.Rptr. 830]; *Excelsior etc. School Dist.* v. *Lautrup, supra,* 269 Cal.App.2d 434, 447; *Port San Luis Harbor Dist.* v. *Port San Luis Transp. Co.* (1963) 213 Cal.App.2d 689, 694 [29 Cal.Rptr. 136]).

In *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 48, footnote 23 [141 Cal.Rptr. 315, 569 P.2d 1303], the California Supreme Court stated: "'*The starting point of every fee award,* once it is recognized that the court's role in equity is to provide just compensation for the attorney *must be a calculation of the attorney's services in terms of the time he has expended on the case.* Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' (*City of Detroit* v. *Grinnell Corp.* (2d Cir. 1974) 495 F.2d 448, 470; . . .)" (Italics added.) While this statement was made in the context of an award of attorney fees under the private attorney general theory rather than for inverse condemnation, it is significant the federal case quoted by the Supreme Court concerned an award of attorney fees in an antitrust case.

The trend of courts in California and around the country is to regard the existence of a contingent fee contract as either irrelevant[8] or as but one

---

[8]Note, however, courts have denied an award of attorney fees if the contingency fails to occur and therefore the property owner is not liable for *any* attorney fees. (See *Franklin-McKinley Sch. Dist.* v. *Lester, supra,* 223 Cal.App.2d 347, 348-349; *City of Los Angeles* v. *Welsh, supra,* 10 Cal.App.2d 441, 443; *City of Long Beach* v. *O'Donnell, supra,* 91 Cal.App. 760, 762.)

factor to be considered by the court when it determines what is a reasonable attorney fee (see *City of Detroit* v. *Grinnell Corp.* (2d Cir. 1974) 495 F.2d 448, 468; *Johnson* v. *Georgia Highway Express, Inc.* (5th Cir. 1974) 488 F.2d 714, 719; *Clark* v. *American Marine Corporation* (E.D.La. 1970) 320 F.Supp. 709, 711 [16 A.L.R.Fed. 637], affd. (5th Cir. 1971) 437 F.2d 959; *Vella* v. *Hudgins, supra,* 151 Cal.App.3d 515, 519; *Jutkowitz* v. *Bourns, Inc.* (1981) 118 Cal.App.3d 102, 111 [173 Cal.Rptr. 248]; *County of Madera* v. *Forrester, supra,* 115 Cal.App.3d 57, 65; *Manatee County* v. *Harbor Ventures, Inc.* (Fla.App. 1974) 305 So.2d 299, 301; *City of Minnetonka* v. *Carlson* (Minn. 1980) 298 N.W.2d 763, 766-767; *Prucka* v. *Papio Natural Resources Dist.* (1980) 206 Neb. 234 [292 N.W.2d 293, 296]; *In re Maratto's Will* (1955 Sur.) 145 N.Y.S.2d 621, 623; *Redev. Com'n. of Winston-Salem* v. *Weatherman* (1974) 23 N.C.App. 136 [208 S.E.2d 412, 415-416]; *Redevelopment Comm'n. of Hendersonville* v. *Hyder* (1973) 20 N.C.App. 241 [201 S.E.2d 236, 239]; *Arneson* v. *City of Fargo* (N.D. 1983) 331 N.W.2d 30, 39-40; 8A Nichols on Eminent Domain (3d ed. 1984) § 15.02[2], p. 15-8.20; Annot. (1974) 58 A.L.R.3d 201, 216-223; but see *Parker* v. *City of Los Angeles, supra,* 44 Cal.App.3d 556, 567 (inverse condemnation); *Lake County Sanitation Dist.* v. *Schultz, supra,* 85 Cal.App.3d 658, 663, 674 (eminent domain proceeding); see also *Glendora Community Redevelopment Agency* v. *Demeter, supra,* 155 Cal.App.3d 465 discussed *infra*).

As was stated in the context of an award of attorney fees in a class action: "[F]avorable public perception and the prestige of the legal profession and our system of justice, requires a formula for computation which can be objectively measured.

"While the size of the class may affect the complexity of counsel's task and the size of the fund created may reflect the quality of his work, the correct amount of compensation cannot be arrived at objectively by simply taking a percentage of that fund." (*Jutkowitz* v. *Bourns, Inc., supra,* 118 Cal.App.3d 102, 111.)

This reasoning applies equally to an inverse condemnation action, particularly since it is taxpayers who generally pay the bill. ▮▮▮ The language of Code of Civil Procedure section 1036 supports an interpretation attorney fees should be objectively measured. By stating fees must be both reasonable and "actually incurred," the Legislature intended to protect the public from both unreasonable fee awards as well as from fee awards that bear no relationship to the amount of attorney time actually incurred in the preparation and trial of the case. This intent is not negated by section 1036's language of reimbursement. Rather, by stating the court should "reimburse

such plaintiff for his . . . reasonable attorney . . . fees," the Legislature instructed the court should award plaintiff actual attorney fees he or she incurred to the extent the fees are reasonable, e.g., to the extent the number of hours actually expended were reasonably necessary and to the extent the hourly rate actually charged was reasonable; both of these being objective measures.

Marina places much reliance on the decision in *Parker* v. *County of Los Angeles, supra,* 44 Cal.App.3d 556, where the appellate court found no abuse of discretion in the trial court's award of attorney fees in an inverse condemnation action based on a contingency fee arrangement:[9] The *Parker* court reasoned: "In considering this question, we first note that a contingent-fee type of compensation rather than a quantum meruit one appears appropriate since under the statute a plaintiff becomes entitled to reasonable attorney's fees only if he prevails in the inverse condemnation action. We note secondly that, unlike an eminent domain proceeding where normally the sole issue is the amount of the property owner's damages, in an inverse condemnation action the plaintiff has the burden of first establishing his legal right to any damages *at all* from the public entity. It therefore generally is a more risky type of litigation for property owners than eminent domain proceedings." (44 Cal.App.3d at p. 567.)

We agree the fact an inverse condemnation action is "more risky" may be reflected in the amount of attorney fees awarded and that "riskiness," difficulty or contingent nature of the litigation is a relevant factor in determining a reasonable attorney fee award. (See *La Mesa-Spring Valley School Dist.* v. *Otsuka, supra,* 57 Cal.2d 309, 316 (the "nature of the litigation, its difficulty" and "the success or failure of the attorney's efforts" should be considered by the trial court); *County of Madera* v. *Forrester, supra,* 115 Cal.App.3d 57, 65-66 (the appraisal theories were not novel); *Mandel* v. *Lackner* (1979) 92 Cal.App.3d 747, 757 [155 Cal.Rptr. 269] (contingent nature of the fee award is relevant to determining fee awards under the private attorney general theory); *San Gabriel Valley Water Co.* v. *City of Montebello, supra,* 84 Cal.App.3d 757, 769 (trial court erred in reducing award given "greater burden assumed by the Company owing to the very nature of inverse condemnation"); *Excelsior etc. School Dist.* v. *Lautrup, supra,* 269 Cal.App.2d 434, 447 (citing factors listed in *La Mesa-Spring Valley School Dist.* v. *Otsuka, supra,* 57 Cal.2d 309, 316); *Port San Luis Harbor Dist.* v. *Port San Luis Transp. Co., supra,* 213 Cal.App.2d

---

[9]The trial court in *Parker* awarded $224,370.77 damages for inverse condemnation, plus attorney fees of $76,646.76—one-third of the actual damages plus interest—the contingent fee agreed upon.

689, 694 (proper to award fee based on time basis plus a reasonable fee on the basis of the work accomplished).) However, inherent "riskiness" of an inverse condemnation action does not justify abandoning all objective standards. Rather, we think the contingent nature of the award should be but one factor considered, not the sole factor.

In oral argument, Marina cited *Glendora Community Redevelopment Agency* v. *Demeter, supra,* 155 Cal.App.3d 465, an abandonment of condemnation case, where the court approved an award of attorney fees based on a contingency fee agreement which it found reasonable in light of other factors considered.[10]

The court reasoned " '[a]ny determination of reasonableness must be framed in the context of the circumstances existent at the time of the fee agreement. . . .' " (*Glendora Community Redevelopment Agency* v. *Demeter, supra,* 155 Cal.App.3d 465, 479.) The court observed contingency fee agreements were a recognized method of pricing legal fees (*id.,* at p. 480), were "particularly advantageous" to a landowner without liquid assets (*id.,* at p. 478), and an agreement where a client compensates his attorney with a share of the "benefit" produced by the attorney's services was reasonable (*id.,* at pp. 478, 480). The court found the particular contingent fee agreement bore ". . . 'a direct relation to the benefit bestowed upon the client . . .' " (*id.,* at p. 478) and the agreed upon share was reasonable given the uncertainty as to the actual value of the property at the time the agreement was executed (*id.,* at p. 479).

The *Glendora* court did not consider time and labor "as significant" except to the extent " '[s]uch time and labor was a contingency recognized by the parties at the time of the attorney-client agreement, . . .' " (*Id.,* at p. 478.) The court rejected the agency's argument the amount of fees

---

[10]The fee agreement in *Glendora* provided the attorney would be paid 15 percent of all amounts recovered by compromise or by judgment in excess of $1.3 million if that occurred within one year, or 25 percent of such excess if the recovery was after one year. The agreement also provided in the event the agency abandoned the proceeding, the percentage fee interests would become equivalent interests in the property. A jury found the property was worth $3,924,114. The trial court awarded $656,028.50, 25 percent of the difference between $3,924,114 and $1.3 million.

According to the agency, this award amounted to an hourly rate of $3,644. (155 Cal.App.3d at p. 477.) However, there was also testimony one attorney spent at least three months on the case and an associate spent 16 to 18 weeks. (*Id.,* at p. 478.)

The other factors considered by the court included: the novelty and difficulty of the questions involved and the skill required to perform the service properly; the likelihood acceptance of the employment precluded other employment; the amount involved and the results obtained; the time limitation imposed by client or circumstances; the nature and length of the professional relationship; the experience, reputation, and ability of the attorneys; the time and labor required; and the informed consent of the client. (*Id.,* at pp. 475-478.)

awarded was unreasonable because it was ". . . 'more than 12 times the fee for which services at an hourly rate would have been obtained from an attorney specializing in condemnation . . . .' " (*Id.,* at p. 479.) The court explained ". . . 'Such calculations are based upon hindsight rather than reasonable expectation.' " (*Ibid.*)

The fallacy of the reasoning in *Glendora* is that it views the reasonableness of the fees from the client's perspective, i.e., whether the client was reasonable in agreeing to share a specified percentage of his recovery with his attorney. However, in *Glendora,* as in the instant case, the fee award is not paid by the client but by the public entity. This is a crucial distinction.

When the award is paid by the client, the inquiry must focus on any agreement the client bargained for and agreed to. Necessarily, the reasonableness of the agreed upon fees must be viewed in light of the reasonable expectation of the client and the circumstances which existed at the time he executed the agreement. In contrast, when the award is paid by the public entity, the bargaining in reaching a contingency fee agreement is of doubtful value since the bargaining was done by the client and his attorney rather than by the public entity and the bargaining is less likely to be a guarantee of reasonableness. If the public entity is bound to the contingent fee agreement, then the client lacks incentive to keep the attorney's share reasonable since the attorney's share will neither come out of the client's recovery nor be paid by the client.

We further believe the *Glendora* analysis is misplaced when it stresses the reasonableness of attorney fees must depend on the circumstances existent at the time the client executed the agreement. This analysis, again, relies on the client's perspective and subjective beliefs as to what is a reasonable fee and gives too little weight to the fact the fee award against the public entity is made not when the parties have only "reasonable expectation" as to the extent of the attorney's services which will be required but when the extent of the attorney's services is known. That the fee award should be based primarily on the circumstances existing at the time of the award is supported by the Legislature's limitation of the award to fees "actually incurred."

We conclude the Legislature contemplated an award of attorney fees based on the amount of time spent on the case and other factors and not based solely on a contingent fee arrangement between attorney and client.

Accordingly, we reverse the award of attorney fees and remand for a redetermination. On remand, the court should begin its analysis with a cal-

culation of the attorney services in terms of time the attorneys actually expended on the case. (*Serrano* v. *Priest, supra,* 20 Cal.3d 25, 48, fn. 23.) The court should then examine such factors as: nature of litigation, contingent nature of award, difficulty, amount involved, skill required in its handling, skill employed, attention given, success or failure of attorneys' efforts, attorneys' skills and learning, including experience in the particular type of work demanded, and novelty of the theories presented. (*La Mesa-Spring Valley School Dist.* v. *Otsuka, supra,* 57 Cal.2d 309, 316; *County of Madera* v. *Forrester, supra,* 115 Cal.App.3d 57, 65; see also *Glendora Community Redevelopment Agency* v. *Demeter, supra,* 155 Cal.App.3d 465, 475; Cal. Rules Prof. Conduct, rule 2-107.) The court may also consider factors enumerated in cases dealing with a fee award under the private attorney general theory (see, e.g., *Mandel* v. *Lackner, supra,* 92 Cal.App.3d 747, 757) since in an inverse condemnation case, like a case where fees are granted under the private attorney general theory, the plaintiff brings a case which should have been initiated by the government.

### C. *Apportionment of Attorney Fees*

■ The District next contends the trial court erred in not apportioning attorney fees as well as other fees and costs awarded between the time spent on the inverse condemnation action where an award of litigation costs is authorized and the causes of action for negligence and nuisance where such authorization is lacking. (See *Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra,* 26 Cal.3d 86, 103-104.) We agree.

However, we note under the unique circumstances of this case where Marina faced overcoming flooding easements and agreements and the court's uncertain ruling as to their effect as well as establishing the District's conduct and decisions caused the Salton Sea to rise and damage their property that most of the time spent preparing the negligence and nuisance case was relevant to establishing the inverse condemnation case and therefore should be allowed.

■ We also note the court erred in awarding Marina costs for filing fees ($30), service fees ($135.44) and travel expenses (over $1,700) incurred in the suit filed against the District in federal court. These costs are not recoverable and should be stricken. (*Tilem* v. *City of Los Angeles, supra,* 142 Cal.App.3d 694, 711.)

## VII

### PREJUDGMENT INTEREST

The District next contends the trial court erred in awarding prejudgment interest at a market rate of interest (10 percent) rather than the legal rate (7 percent).[11]

Recently, the California Supreme Court in an eminent domain case held the "just compensation" clauses of the state and federal Constitutions require interest on a landowner's lost use of money between the time of a taking and a full payment for the property must be calculated "at a rate reasonable in light of market conditions." (*Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790, 801 [214 Cal.Rptr. 904, 700 P.2d 794].) Previously, the Supreme Court has held prejudgment interest is likewise compelled by the just compensation clauses in inverse condemnation cases. (*Holtz* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 17 Cal.3d 648, 657; *Heimann* v. *City of Los Angeles* (1947) 30 Cal.2d 746, 759-760.)

In *Gilmore,* the Supreme Court held, under the just compensation clause, a landowner is entitled to the " 'full and perfect' monetary equivalent of the fair market value of the land paid at the time the taking occurred." (*Redevelopment Agency* v. *Gilmore, supra,* 38 Cal.3d 790, 801.) The *Gilmore* court concluded the statutory rate of interest in times when the cost of money is high, will not provide for the " 'full and perfect' monetary equivalent."

The court rejected an interest calculation based solely on either the landowner's cost of borrowing funds to secure replacement property (*Redevelopment Agency* v. *Gilmore, supra,* 38 Cal.3d 790, 802) or the public entity's cost of borrowing funds in its usual financial markets. (*Id.,* at p. 804.) Rather, the court adopted the "prudent investor principal," that is, "the rate which would have been earned by ' "a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal." ' " (*Id.,* at p. 803.) The court suggested: "[T]he trial court should examine, at the condemnee's behest, the rates prevailing during the period a condemnation payment was delayed for all forms of money-market obligations, governmental and private, which prudent depositors and inves-

---

[11]On June 8, 1976, the California Constitution, article XV, section 1, was adopted establishing the legal rate of interest at 7 percent but authorizing the Legislature to increase the legal rate to a maximum of 10 percent. In 1982, the Legislature increased the legal rate to 10 percent, effective on interest accruing after July 1, 1983. (Code Civ. Proc., § 685.010.) The judgments here were entered on May 7, 1982.

tors normally purchase for income purposes, and whose terms or maturities fall within the period of delay." (*Id.*, at p. 806, fn. omitted.)

Such a determination would be on a case-by-case basis. (*Redevelopment Agency* v. *Gilmore, supra,* 38 Cal.3d 790, 806.) While recognizing "[c]omputations may vary somewhat from case to case," the court concluded "that alone does not mean that any litigant has been denied just compensation." (*Id.*, at p. 807.) Rather, the court reasoned "the range between the lowest and the highest [relevant money-market rates] is rarely extreme" and therefore "gross disparities in the interest results" not likely. (*Ibid.*, fn. omitted.) "Just compensation is achieved if, for the entire period of delay, the actual total interest earned on the unpaid portion of the condemnation judgment was not substantially below that which a prudent investor of the funds would have earned during the same period." (*Redevelopment Agency* v. *Gilmore, supra,* 38 Cal.3d 790, 807, fn. 19.) The trial court's determination is to be upheld on appeal if it is supported by substantial evidence. (*Id.*, at p. 807.)

 Here, Marina presented Moody's Composite Index of Corporate Bond Rates as an indicator of the market rate and argued for interest at 10.81 percent. In *Gilmore,* the Supreme Court specifically approved the use of Moody's Investors Service. (38 Cal.3d 790, 806.) The court awarded 10 percent in prejudgment interest. On appeal, that rate is not challenged as being unreasonable nor do we find it unreasonable.

Most recently, this court in *Imperial Cattle Co.* v. *Imperial Irrigation Dist.* (1985) 167 Cal.App.3d 263 [213 Cal.Rptr. 622], reversed an award of prejudgment interest at a market rate to a landowner who brought an inverse condemnation action. *Imperial Cattle* was decided before the Supreme Court's decision in *Gilmore;* however, the Supreme Court after its *Gilmore* decision denied a hearing in *Imperial Cattle* (hg. den. Aug. 22, 1985).

*Imperial Cattle* is factually distinguishable from the instant case in that it involved a temporary, unintentional flooding which damaged Imperial Cattle Co.'s feedlot and cattle. We noted: "Whatever persuasive force this constitutional 'market rate theory' has, it is most compelling where a government entity uses its power of condemnation to take private property before paying the owner its fair market value." (*Id.*, at p. 273.) We further noted this same rationale was arguably applicable to "those inverse condemnation cases which are merely a substitute for direct condemnation, that is, where the government has intentionally taken or damaged a citizen's property interest without prior payment." (*Ibid.*)

We observed, however, in inverse condemnation cases such as *Imperial Cattle,* where the claimed damage was neither intentional nor immediate, the action "appears very much to be a special specie of tort liability applicable only to the government." (*Id.,* at p. 274, fn. omitted.) We questioned "the logic and fairness of a rule which would allow such [a market rate of] interest in that limited number of unintentional damage cases which can be molded into an inverse condemnation rubric while denying similar interest in all other cases." (*Ibid.*) We concluded the landowner in *Imperial Cattle* was entitled only to the legal rate of prejudgment interest.

In the instant case there was a permanent taking of the use of land, not merely a damaging caused by temporary, unintentional flooding. This inverse condemnation action is not merely a specie of tort, but a substitute for a direct action, i.e., the District's taking of Marina's land as a repository for its excess irrigation waters. As such, Marina is entitled to interest calculated at a market rate.

Thus the *Imperial Cattle* decision presciently marked the boundaries between the "unintentional damage cases which can be molded into an inverse condemnation rubric" and damage inflicted by a governmental body which is "intentional and immediate." (*Imperial Cattle Co.* v. *Imperial Irrigation Dist., supra,* 167 Cal.App.3d 263, 274.) The case at bench clearly falls at that end of the factual spectrum, authorizes market rate prejudgment interest.

▉ The District also contends the court erred in compounding the interest annually.

▉ As a general rule, compound interest is impermissible unless specifically authorized by statute or by stipulation of the parties. (*Estate of Sharp* (1971) 18 Cal.App.3d 565, 585 [95 Cal.Rptr. 816]; *State of California* v. *Day* (1946) 76 Cal.App.2d 536, 554 [173 P.2d 399].)

▉ The California Supreme Court did not address the issue of compounding interest in *Redevelopment Agency* v. *Gilmore, supra,* 38 Cal.3d 790. However, one of the cases cited with approval in *Gilmore, United States* v. *429.59 Acres of Land* (9th Cir. 1980) 612 F.2d 459, did approve an award of compounded interest. In that case, the Ninth Circuit held: "Compounding of interest is appropriate to compensate the landowners for the loss of use of the interest that the deficiency award would have been producing for them during the interim." (*Id.,* at p. 465.)

Such reasoning seems to comport with the prudent investor principle since it is apparent a prudent investor would seek compound rather than simple interest.

Moreover, it would be anomalous to deny compounding of interest to an inverse condemnee when an individual subject to a direct condemnation is presumably entitled to it. (See Code Civ. Proc., §§ 1255.070, 1255.075.)

In sum, the court did not err in calculating the award of prejudgment interest.

## VIII

### EASEMENT/INJUNCTION

The next issues concern the use and ownership of Marina's property in the future. On the one hand, Marina moved for a permanent injunction to require the District to change its water management practices so as to remove the water standing on their property even though they had been fully compensated for that property. On the other hand, the District sought leave to amend according to proof for flooding easements across Marina's property up to the minus 226.5-foot level,[12] easements which would encompass not only property for which damages were awarded but also property for which none was awarded.

The trial court denied Marina's request for an injunction, granted the District's motion to amend and ordered easements in favor of the District up to the minus 226.5-foot level but failed to include the order in any of the judgments.[13]

### A. *Easements*

 ██ It is well settled in an inverse condemnation case where there has been found a taking, the public entity acquires an interest in the property in return for the payment of damages. (*Mehl* v. *People* ex rel. *Dept. of Public Works* (1975) 13 Cal.3d 710, 715, 718, fn. 4 [119 Cal.Rptr. 625, 532 P.2d 489]; *Elmore* v. *Imperial Irrigation Dist.*, *supra*,

---

[12]For the purposes of trial, the minus 226.5-foot level was used as the level of the Salton Sea.

[13]The court, in a minute order, provided: "ORDER OF THE COURT the motion is granted to reflect that the District has acquired an easement in all of the subject properties, to the level of 226.5 and this is done by virtue of the determination by the jury that there has been a taking."

159 Cal.App.3d 185, 198; *Podesta* v. *Linden Irr. Dist.* (1956) 141 Cal.App.2d 38, 53 [296 P.2d 401]; *Beckley* v. *Reclamation Board* (1962) 205 Cal.App.2d 734, 746 [23 Cal.Rptr. 428]; *Inns* v. *San Juan Unified School Dist.* (1963) 222 Cal.App.2d 174, 180 [34 Cal.Rptr. 903]; contrast *Orme* v. *State of California* ex rel. *Dept. Water Resources, supra,* 83 Cal.App.3d 178, where landowners recovered in inverse condemnation for damages to their rice crops for several years due to water seepage from a state reservoir; *Shaeffer* v. *State of California* (1970) 3 Cal.App.3d 348, 352 [83 Cal.Rptr. 347], where the court noted that a "one-time flooding is not the equivalent of a flowage easement" but could be the basis for an inverse condemnation cause of action.)[14] Marina asserts a prerequisite to awarding an interest in property to the public entity in an inverse condemnation case is a showing that public use is necessary, i.e., the District had the "right to condemn the property." To support this assertion, they rely on statutes concerning direct condemnation. (Code Civ. Proc., § 1240.030, subd. (a); Wat. Code, § 22426.)[15]

Marina's reliance on statutes concerning direct condemnation is misplaced. In a resisted direct condemnation proceeding, the focus is not on whether compensation should be paid but on whether there should be any taking at all. In contrast, in an inverse condemnation proceeding, there is no question whether the taking should occur because it has already occurred, rather the focus is on the amount of compensation, if any, that should be awarded. The landowner who brings an inverse condemnation action for a taking of his or her property essentially concedes the issue of propriety of the taking by choosing to seek monetary damages for the taking rather than an injunction or writ of mandate.

---

[14]Marina contested the District's motion to amend its pleadings to conform to proof so as to seek the easements. Such an amendment lies within the discretion of the trial court and is favored. (See *Union Bank* v. *Wendland* (1976) 54 Cal.App.3d 393, 400 [126 Cal.Rptr. 549].) Here, the proof presented of inverse condemnation and the award of damages amply support the court's exercise of discretion. Moreover, it is not clear an amendment to the pleadings was necessary since the District was entitled to an interest as a matter of law. (See *Inns* v. *San Juan Unified Sch. Dist., supra,* 222 Cal.App.2d 174, 180, where the appellate court modified the judgment on appeal to reflect an easement acquired by the school district by virtue of award of damages in inverse condemnation; contra: *Steiger* v. *City of San Diego* (1958) 163 Cal.App.2d 110, 117 [329 P.2d 94].)

[15]Code of Civil Procedure section 1240.030 reads: "The power of eminent domain may be exercised to acquire property for a proposed project only if all of the following are established:

"(a) The public interest and necessity require the project.

"(b) The project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury.

"(c) The property sought to be acquired is necessary for the project."

Water Code section 22426 reads: "Any property necessary for the purposes of the [irrigation] district may be acquired by the district and held subject to liens, incumbrances, or obligations on it at the time of its acquisition."

Marina relies on *Steiger* v. *City of San Diego, supra,* 163 Cal.App.2d 110, 115-117, an inverse condemnation case, where the court held the trial court was correct in awarding damages without granting a drainage easement because there had been only a damaging of property rather than a "taking" and because the city had failed to seek an easement in its pleading. However, the *Steiger* court specifically noted it was not deciding whether the city might seek and obtain an easement in a separate proceeding. In the instant case, the trial court exercised its discretion in allowing an amendment to conform to proof and Marina sought recovery based on a permanent taking rather than a damaging. Therefore, *Steiger* is distinguishable.

Marina is correct in their contention if the District is entitled to an interest in their property, then the District is only entitled to an interest to the extent it has paid compensation. ■■■ ■■■■ ■■■ Therefore, to the extent Marina sought and received compensation for the full market value of their land and improvements which were flooded, the District has acquired a flooding easement.[16] To the extent Marina did not seek nor receive compensation for land or improvements, e.g., because they were protected by dikes, pumping, etc., whether or not they were above or below the minus 226.5-foot-contour line, the District has acquired no interest since there was no determination a taking had occurred as to that property, and consequently, no award of compensation. Accordingly, the judgments must be modified to reflect the interests actually acquired by the District as a result of this inverse condemnation cause of action.

## B. *Injunction*

■■■ The grant or denial of a permanent injunction lies within the discretion of the trial court and its decision will be upheld on appeal absent an

---

[16]Marina notes: "It is ironic that the Court, with apparent concern over excess entanglement, should rule that the Appellant should now be given new easements which, the original ruling being correct, would still not protect Appellant from damages resulting from the continuing unreasonable practices."

There are significant differences, however, between the easements the court ordered and the easements in the "easement" documents since (1) the original "easement" documents were vague and created exculpatory clauses rather than interests in land and (2) Marina will have been fully compensated for the easements ordered here.

Additionally, we note Marina's damages should be minimal in the future as to the area where the District has acquired an interest since Marina cannot build on the property in a manner inconsistent with its use for flooding (see *City of Los Angeles* v. *Ingersoll-Rand Co.* (1976) 57 Cal.App.3d 889, 893 [129 Cal.Rptr. 485] (" '[E]very incident of ownership not inconsistent with the easement and the enjoyment of the same, is reserved to the grantor . . . .' "); see also *Beckley* v. *Reclamation Board, supra,* 205 Cal.App.2d 734, 746, delineating actions inconsistent with a servitude of permanent overflow; and cases involving flood plain zoning: *Helix Land Co.* v. *City of San Diego, supra,* 82 Cal.App.3d 932; *Zisk* v. *City of Roseville* (1976) 56 Cal.App.3d 41 [127 Cal.Rptr. 896]; *Turner* v. *County of Del Norte, supra,* 24 Cal.App.3d 311.)

abuse of discretion. (*Jessen* v. *Keystone Savings & Loan Assn.* (1983) 142 Cal.App.3d 454, 458 [191 Cal.Rptr. 104].)

 Marina moved for a permanent injunction at the conclusion of trial requiring the District to remove water then standing on their property. Since Marina received full compensation for the flooded property (rather than only compensation for loss of use over a limited time period), the trial court properly denied Marina's request for an injunction. Necessarily, Marina cannot have it both ways—full compensation for value of flooded property and return of the flooded property. The trial court did not abuse its discretion here.[17]

## IX

### DEPOSIT OF FUNDS PENDING APPEAL

 Finally, the District contends the trial court erred in requiring the District to deposit into court the amount of the jury's verdict, exclusive of attorney fees, plus costs and interest pending appeal. However, as conceded by the District, this point is moot since the order was stayed pending appeal.

The judgment is affirmed except to the extent we reverse the award of costs associated with the federal suit and remand for a redetermination of attorney and witness fees conformable to this opinion for specification in the judgment and the property interest acquired by the District.

Wiener, J., and Butler, J., concurred.

On October 30, 1985, the opinion was modified to read as printed above.

---

[17]Since we have affirmed denial of the injunction, we do not discuss the District's contention Marina was precluded from raising the issue due to their failure to request an injunction in their pleadings.